No. 04-881

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 173

IN THE MATTER OF R.T.,

    A Youth In Need Of Care.

APPEAL FROM:    The District Court of the Sixteenth Judicial District,
In and For the County of Carter, Cause No. DN 2002-01,
Honorable Joe E. Hegel, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Mark Epperson, Attorney at Law, Miles City, Montana

    For Respondent:

        Honorable Mike McGrath, Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

        Judy Williams, Assistant Attorney General, Child Protection Unit,
Billings, Montana

        Richard O. Harkins, County Attorney, Ekalaka, Montana

Submitted on Briefs:  May 31, 2005

Decided:  July 12, 2005

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     W.B. appeals from the judgment entered by the Sixteenth Judicial District Court, Carter County, on November 8, 2004, pursuant to its findings of fact, conclusions of law and order terminating her parental rights to R.T.  We affirm.

¶2     We address the following issue:

¶3     Did the District Court abuse its discretion in terminating W.B.'s parental rights after concluding the conduct or condition rendering her unfit was unlikely to change within a reasonable time?

### FACTUAL AND PROCEDURAL BACKGROUND

¶4     R.T. was born December 13, 1999, to W.B., natural mother, and J.T., natural father. W.B. took R.T. and her two other children with her when she moved from Montana to Ontario, Oregon, in March 2002.  In September 2002, after J.T. visited W.B. and the children several times, W.B. allowed J.T. to take R.T. back with him to Carter County, Montana, believing it would be a positive experience for R.T., because R.T. was having behavioral problems and really missed his father.  W.B. currently resides in Fruitland, Idaho, with her two daughters.

¶5     Just weeks after R.T. moved back with his father, J.T. broke into an Ekalaka residence and threatened the residents with a gun, resulting in an investigation of his home that led to the discovery that the home was without running water, electricity, and was extremely unsanitary.  On October 25, 2002, after repeated referrals alleging physical neglect, unsanitary living conditions, and domestic violence, as well as previous investigations of

2

W.B.'s and J.T.'s parenting dating back to 1996, the Department of Public Health and Human Services, Child and Family Services Division (Department) filed a petition for emergency protective services and temporary investigative authority regarding R.T. The District Court granted the petition on October 29, 2002, and, pursuant to a stipulation of the parties, subsequently entered an order adjudicating R.T. as a youth in need of care and granting the Department temporary legal custody.

¶6 After the Department obtained temporary legal custody over R.T., the Department prepared and the court approved a treatment plan for W.B. extending from February 19, 2003, to August 19, 2003. The tasks and goals included in the treatment plan were designed to make it possible for R.T. to be reunited with W.B. The plan identified the problems or conditions that resulted in the abuse and neglect of R.T., contained treatment goals and objectives, included specific time frames, and identified the treatment objectives along with the roles and responsibilities of W.B. A second treatment plan covering the time period from April 8, 2003, to February 24, 2004, containing essentially the same goals and tasks, was ordered by the District Court after W.B. failed to complete the first treatment plan.

¶7 W.B. never provided verification that she completed any tasks and goals during the second treatment plan and, in fact, failed several treatment requirements: she failed to maintain a drug-free home; failed to follow the recommendations of her chemical dependency evaluation (by walking out of treatment); failed to refrain from criminal activity; failed to complete parenting classes; and failed to cooperate with the Department regarding the provision of services. Although W.B. did complete some of the tasks and/or goals of her

3

plan, she failed to resolve her most significant and troubling issue, chemical dependency. W.B. tested positive for marijuana three times in February and March of 2003, and admitted she was still using as late as April 2004. W.B. failed to complete either of her treatment plans and conceded in her testimony that she has "a lifetime of things" that need correcting, and R.T. cannot wait any longer.

¶8 In November 2003, the Department filed a petition for permanent legal custody and termination of W.B.'s parental rights. The termination hearing was held on July 22, 2004, twenty months after R.T. was placed in foster care. Dr. Ned Tranel (Dr. Tranel), a Ph.D. clinical psychologist, testified by deposition and acknowledged that when he first evaluated R.T. in November 2002, he had described R.T.'s behavior as very chaotic and displaying a lot of symptoms similar to autistic spectrum disorder. Dr. Tranel again evaluated R.T. in January 2004, and at that time concluded that autistic spectrum disorder was no longer a serious consideration, but R.T.'s "maladaptive behaviors were still so extensive that they were tending to cancel out a lot of the other developmental patterns."

¶9 Although R.T. had spent a short time in J.T.'s care prior to his removal, Dr. Tranel opined that R.T. must have been exposed to inappropriate, chaotic parenting over a longer period of time, dating back to before his first birthday, because more than just a few months of bad parenting was required for such severe problems to develop. According to Dr. Tranel, R.T. exhibited an emotional disturbance that indicated he suffered from pathological parenting, which Dr. Tranel described as parenting that "was grossly inadequate, but more importantly it was what we call a pathogenic environment; that is, it generated pathological

4

behaviors, development patterns." Despite grossly inadequate parenting and the serious nature of R.T.'s problems, Dr. Tranel testified that R.T. is intelligent and still young enough to recover, but he needs to be in a safe, nurturing environment that will accommodate his special needs.

¶10 On November 2, 2004, following the hearing and submission of post-hearing deposition testimony, the District Court ordered the termination of the parent-child relationship between R.T. and his parents, W.B. and J.T., and awarded permanent legal custody of R.T. to the Department, with a representative of the Department authorized to consent to R.T.'s adoption. W.B. appeals therefrom. J.T. did not appeal and, therefore, the termination of his parental rights is not at issue herein.

## STANDARD OF REVIEW

¶11 "A district court's decision to terminate parental rights is discretionary and we review that decision to determine whether the court abused its discretion." *In re J.W.*, 2001 MT 86, ¶ 7, 305 Mont. 149, ¶ 7, 23 P.3d 916, ¶ 7 (citing *In re Custody of C.F.*, 2001 MT 19, ¶ 11, 304 Mont. 134, ¶ 11, 18 P.3d 1014, ¶ 11). However, "[a] parent's right to care and custody of a child is a fundamental liberty interest." *In re J.A.B.*, 1999 MT 173, ¶ 14, 295 Mont. 227, ¶ 14, 983 P.2d 387, ¶ 14. Therefore, when determining whether to terminate parental rights, a district court must make specific factual findings in accordance with the requirements set forth in § 41-3-609, MCA. *Custody of C.F.*, ¶¶ 11-12. We review those findings of fact to determine whether they are clearly erroneous. *Custody of C.F.*, ¶ 11. In *In re J.W.*, this Court explained the clearly erroneous standard as follows:

A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake.

*In re J.W.*, ¶ 7 (citing *Custody of C.F.,* ¶ 11). We review a district court's conclusions of law in terminating parental rights for correctness. *In re B.F.*, 2000 MT 231, ¶ 7, 301 Mont. 281, ¶ 7, 8 P.3d 790, ¶ 7.

## DISCUSSION

¶12 ***Did the District Court abuse its discretion in terminating W.B.'s parental rights after concluding the conduct or condition rendering her unfit was unlikely to change within a reasonable time?***

¶13 "[A] natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *Matter of R.B.* (1985), 217 Mont. 99, 103, 703 P.2d 846, 848. However, the court's primary consideration is "the physical, mental, and emotional condition and needs of the child," § 41-3-609(3), MCA, and, therefore, the "best interests of the children are paramount and must take precedence over parental rights." *Matter of C.M.* (1997)*,* 281 Mont. 183, 187, 932 P.2d 1063, 1066.

¶14 A district court may terminate a person's parental rights to a child if it finds that the child has been adjudicated a youth in need of care, an appropriate court-approved treatment plan has not been complied with or has been unsuccessful, and the conduct or condition rendering the parent unfit is unlikely to change within a reasonable period of time. Section 41-3-609(1)(f), MCA. In the case at bar, the District Court found that these three statutory conditions had been established and terminated W.B.'s parental rights on that basis. W.B.

6

does not challenge R.T.'s status as an adjudicated youth in need of care or her failure to complete the treatment plans. Therefore, at issue is whether the conduct or condition rendering W.B. unfit was unlikely to change within a reasonable time.

¶15 Section 41-3-609(2), MCA, furnishes the criteria for a court to consider for determining whether a parent's conduct or condition is likely to change in a reasonable period of time or if it is likely to continue. This statute provides:

> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:
> (a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;
> (b) a history of violent behavior by the parent;
> (c) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child; and
> (d) present judicially ordered long-term confinement of the parent.

¶16 In accordance with this statute, the District Court determined R.T. was abused and neglected through actual mistreatment and by exposure to unreasonable risk, and W.B. was unable or unwilling to correct her condition within a reasonable time. Therefore, the court concluded that R.T.'s urgent need for stability and consistency required that his mother's rights be terminated so he could be placed in a permanent home.

¶17 W.B. argues the District Court abused its discretion by terminating her parental rights to R.T. because ample evidence was presented demonstrating she was fit to parent R.T. W.B. asserts that she successfully completed several of the required tasks, including

7

demonstrating appropriate parenting skills during visits with R.T., maintaining weekly contact with her social worker, obtaining and maintaining a home with adequate sleeping arrangements, electricity, and running water, and was working toward completion of other tasks. W.B. acknowledges her failure to complete inpatient drug-treatment, but argues that her new-found willingness to obtain a chemical dependency evaluation and undergo the recommended treatment for her marijuana use provided sufficient evidence to demonstrate that her conduct was likely to change in a reasonable time. W.B. asserts she was providing a safe, stable home for her two daughters in Fruitland, Idaho, and offers that the testimony given by Jody Stark, Lynn Stevens, DeeAnn Smith-Davis, and herself provided ample evidence that she was also fit to parent R.T., which should leave this Court with the definite and firm conviction that the District Court erred in finding otherwise.

¶18    The Department notes that R.T. has a very serious attachment and behavioral disorder caused by long-term "pathological parenting," which W.B. cannot handle now or within a reasonable time. Because R.T. cannot wait any longer, which it notes that W.B. even acknowledged, the Department argues the District Court did not abuse its discretion in terminating W.B.'s parental rights. The Department also explains this case falls under the purview of § 41-3-604(1), MCA, the statutory presumption that the child's best interests would be served by termination of parental rights, because R.T. had been in foster care for at least "15 months of the most recent 22 months."

¶19    The District Court held, pursuant to § 41-3-609(2), MCA, that:

> The conduct or condition of the parents rendering them unfit, including chemical dependency issues, psychological problems . . . is unlikely to change

8

in a reasonable time. In particular, the Court notes that W.B.'s efforts have been too little, too late.

The District Court found that W.B. had sufficient time to complete the tasks contained in her treatment plans to ensure a safe home for R.T., she acknowledged she had not completed her treatment plans, and she was unable to articulate what had changed that would allow her to complete her treatment plan if she was given more time. In addition, the court noted that, pursuant to § 41-3-609(3), MCA, the court's primary consideration is the physical, mental and emotional condition and needs of the child, and that § 41-3-604(1), MCA, creates a presumption that termination of the parents' rights are in the child's best interest if the child has been in foster care for fifteen of the previous twenty-two months.

¶20    W.B. did not express disagreement with the goals of the treatment plan when they were established, had sufficient time and adequate opportunities to address and remedy the problems identified by the Department as those which prevented her from parenting her son, and yet she failed to address the most significant and troubling issue she needed to resolve, her chemical dependency. During the period her treatment plans were in effect, she had inconsistent attendance at individual counseling appointments, had three consecutive positive UA tests, and walked out of inpatient treatment only five days after her admission.

¶21    W.B. repeatedly admitted to using marijuana. Although aware she needed treatment, and that the treatment plans, which were in effect for almost twenty months, were designed to reunite her with R.T., she only re-initiated chemical dependency treatment eight days before the hearing. W.B. testified she did not notify the Department that she again started treatment, because she "believed it was probably too late."

9

¶22 R.T. is now five years old and, according to Dr. Tranel's testimony, exhibits emotional disturbance of a nature and duration that indicate he has suffered from "pathological parenting," which he described as nearly a total lack of the things young children need most, safety and nurturing. R.T.'s disturbance was serious enough that Dr. Tranel believed it developed over a substantial period of time and was attributable to grossly inadequate parenting by both parents. Since October 2002, R.T. has been in foster care and, although he has made progress in his foster home, Dr. Tranel testified that for R.T. to overcome his emotional disturbance "he urgently needed an environment that was therapeutic" and provided the necessities for normal child development: nurturing, safety, and attachment. W.B. was unable to care for R.T.'s special needs or provide the therapeutic care R.T. required within a reasonable time.

¶23 The testimony of DeeAnn Smith-Davis (Smith-Davis), a Master's level social worker, Jody Stark, a nurse practitioner that runs a clinic in Oregon, and Lynn Stevens (Stevens), a Master's level social worker, did not validate W.B.'s claim that her condition would change in a reasonable time. Smith-Davis did a home evaluation of W.B. on July 11, 2004, only eleven days before trial, and based upon a forty-five minute interview, along with a review of a psychological evaluation of W.B., concluded that W.B. could be an adequate parent for R.T. However, Smith-Davis failed to contact the Department social workers that had worked with this family or look at previous drug and alcohol evaluations concerning W.B. before reaching her conclusion, and acknowledged that, had she been

made aware of all the information, she may have changed her recommendations regarding W.B.'s ability to complete the treatment.

¶24   Furthermore, W.B. was not honest about the nature of her chemical dependency. She reported to Natalie Adorni, a social worker, that she was merely a recreational pot smoker and that it did not affect her ability to effectively care for her children, but at the termination hearing she testified she used marijuana for self-medication of her migraine headaches, a claim found not to be credible by the District Court. Stevens also testified that when she conducted the most recent chemical dependency evaluation, W.B. never mentioned migraine headaches or that her marijuana use was related to such headaches. The evidence offered by the three witnesses failed to show that W.B. made significant steps towards changing her condition within a reasonable time, but rather demonstrated W.B.'s dishonesty and an untimely effort to begin treatment.

¶25   This Court has held that because the courts cannot see into the future "to determine whether a parent's conduct is likely to change, that determination must, to some extent, be based on the parent's past conduct." *In re M.R.G.*, 2004 MT 172, ¶ 31, 322 Mont. 60, ¶ 31, 97 P.3d 1085, ¶ 31. We concur with the District Court's finding that, from W.B.'s past conduct, it appears unlikely that W.B. will be able to correct her chemical dependency and adequately address R.T.'s special needs within a reasonable time. Moreover, this Court agrees with the District Court's finding that W.B.'s efforts have been too little, too late. The Department made reasonable efforts to assist W.B. in completing her treatment plan, including referrals and payment for a variety of services. The Department also gave W.B.

11

an adequate opportunity to address and remedy the problems identified by the Department that prevented her from adequately parenting her son, including her chemical dependency issues, and she did not. W.B. failed to provide sufficient evidence showing what has changed that would now cause her to complete the treatment in a reasonable time.

¶26 Having concluded that the District Court did not err in determining the conduct or conditions which render W.B. unfit to parent are not likely to change within a reasonable time, we hold the District Court did not abuse its discretion in terminating W.B.'s parental rights.

¶27 Affirmed.

/S/ JIM RICE

We Concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS