No. 04-882

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 42

_____

IN THE MATTER OF DECLARING A.N.W.,
A Youth in Need of Care.

J.Q.,

          Appellant.

_____

APPEAL FROM:    District Court of the Eleventh Judicial District,
                    In and for the County of Flathead, Cause No. DN 2002-012(C)
                    The Honorable Katherine R. Curtis, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Robert B. Allison, Attorney at Law, Kalispell, Montana

        For Respondent:

                Hon. Mike McGrath, Attorney General; Ilka Becker, Assistant Attorney
                General, Helena, Montana

                Ed Corrigan, Flathead County Attorney; Peter Steele, Deputy County
                Attorney, Kalispell, Montana

_____

                    Submitted on Briefs: November 15, 2005
                            Decided:  February 28, 2006

Filed:

_____
                Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     J.Q. appeals from the Eleventh Judicial District Court, Flathead County's order terminating his parental rights to his daughter, A.N.W., and awarding permanent legal custody, with the right to consent to adoption, to the Montana Department of Public Health and Human Services (Department).  We affirm.

¶2     We address the following issues on appeal:

¶3     1.  Did District Court Judge Stadler's action in conducting a show cause hearing and entering an order granting the Department emergency protective services and temporary investigative authority (TIA) after he signed an order recusing himself invalidate the subsequent parental termination proceeding?

¶4     2.  Did the District Court afford J.Q. a fundamentally fair procedure when it ended the youth in need of care hearing before J.Q. could cross-examine the CASA volunteer and present two additional witnesses?

¶5     3.  Did the District Court's failure to bifurcate the dispositional hearing from the youth in need of care hearing violate J.Q.'s right to a fundamentally fair process?

¶6     4.  Did the District Court improperly consider documented evidence regarding J.Q.'s parole status that the Department filed after the termination hearing's conclusion when the evidence accurately reflected J.Q.'s parole status and confirmed his parole officer's testimony at the hearing?

¶7     5.  Do the Department's alleged failures to comply with all of the statutory and court imposed deadlines surrounding J.Q.'s treatment plan affect the disposition of the case absent a showing of prejudice to J.Q.?

2

¶8    6. Did the District Court abuse its discretion when it terminated J.Q.'s parental rights?

### PROCEDURAL AND FACTUAL BACKGROUND

¶9    J.Q. and his wife, R.W., initiated proceedings to dissolve their marriage in 2000. The custody of their only daughter, A.N.W., represented the major issue in the dissolution. J.Q. revealed during the dissolution proceedings that he had a sexual relationship with a step daughter from a prior marriage from the time the girl was four years old until she was 17. J.Q. admitted also to being sexually attracted to his wife's niece from the time the niece turned 13 until she was 19. J.Q.'s prior deviant sexual behavior toward his young female family members prompted the District Court to order the Department to supervise all of J.Q.'s visitation with A.N.W. during the dissolution process. R.W. died in May of 2000, before the court resolved the parenting plan.

¶10   The Department placed A.N.W. in the care of her maternal grandmother following R.W.'s death. The Department moved A.N.W. after less than a year, however, based on evidence that her two male cousins had sexually abused the five-year old while she was living with her grandmother. The Department petitioned for TIA in November of 2000, and placed A.N.W. with her maternal uncle and aunt, N.F. and D.F., in Washington state. N.F. and D.F. subsequently petitioned for, and the Department granted them, guardianship over A.N.W. J.Q. challenged the guardianship proceeding and the District Court set aside the guardianship in March of 2002.

¶11   The District Court's decision to set aside the guardianship prompted the Department to petition the District Court for emergency protective services and TIA on

April 4, 2002. The Department alleged that J.Q.'s prior admissions regarding his long-term sexual relationship with his adopted daughter and his long-time sexual attraction to his young niece left A.N.W. in danger of being abused and neglected without proper protection. District Court Judge Stewart E. Stadler scheduled the show cause hearing for April 12, 2002.

¶12 Judge Stadler informed the parties before the hearing that he had presided in the earlier dissolution and guardianship proceedings, and, consequently, he deemed himself disqualified from presiding over the case. He had signed a relinquishment and acceptance order the previous day that disqualified him and had invited Judge Katherine R. Curtis to assume jurisdiction. Judge Curtis also had signed the order.

¶13 Judge Curtis was not available to preside at the hearing, however, and the third judge in the Eleventh Judicial District was in trial. Judge Stadler reminded J.Q. that he had a right to a hearing within ten days and then explained J.Q.'s options: either stipulate to an extension or proceed and Judge Stadler would "be the one that makes the . . . probable cause determination." J.Q.'s counsel responded that he had no choice but to proceed because J.Q. would not relinquish his right to a hearing within ten days.

¶14 Judge Stadler conducted the hearing and ruled from the bench in granting the Department emergency protective services and TIA. Judge Stadler signed a written order to that effect on April 25, 2002. The clerk of court earlier had filed the relinquishment and acceptance order on April 15, 2002.

¶15 The Department next petitioned the District Court to adjudicate A.N.W. a youth in need of care and to grant the Department temporary legal custody (TLC). The District

4

Court, Judge Curtis now presiding, scheduled a one-day hearing on the Department's petition for July 1, 2002. At the end of a full day of testimony, the Court warned the parties that it had limited time for the hearing to continue to the next day. Judge Curtis concluded the hearing the following day for lack of time after A.N.W.'s appointed counsel and the court examined the CASA volunteer. The court did not allow J.Q. or the Department to cross-examine the CASA volunteer and the court did not allow J.Q. to present testimony from his remaining two witnesses.

¶16    The District Court entered its order on July 22, 2002, adjudicating A.N.W. a youth in need of care and granting the Department TLC for six months. The court also ordered the Department to prepare a treatment plan for J.Q. and to present the court with a written report by December 2, 2002. The Department filed the report on December 10, 2002.

¶17    On November 13, 2002, the Department moved for the District Court to approve its proposed treatment plan for J.Q. The following week the Department also sought to extend its TLC for an additional six months. The District Court held a hearing on the Department's two motions on December 18, 2002. The hearing did not conclude that day, so the court scheduled it to resume on January 16, 2003. The court also granted the Department continued TLC pending the outcome of the hearing.

¶18    In the meantime, the state of Wisconsin issued an arrest warrant for J.Q. relating to 24 separate felony offenses of failure to pay child support for another child. The Flathead County Sheriff's Department arrested J.Q. pursuant to the Wisconsin warrant on January 3, 2003. The District Court completed the hearing on the treatment plan and TLC extension as scheduled on January 16, 2003. J.Q. appeared in custody with his counsel.

¶19 The District Court once more extended the Department's TLC until July 16, 2003, and ordered the Department to file a written report by June 16, 2003. The court's January 29, 2003, order also approved the treatment plan under the condition the Department incorporate eleven specific changes to the plan. The court ordered J.Q. to abide by the amended treatment plan's terms and conditions upon his release from custody.

¶20 The Department petitioned the District Court again on June 5, 2003, to extend its TLC for an additional six months. The Department asserted that J.Q. remained incarcerated in Wisconsin and was not expected to be released until October of 2003 at the earliest. The Department further stated that it would support J.Q. in completing his court-approved treatment plan if he were released within a reasonable period of time. If J.Q. remained incarcerated, however, the Department informed the court that it would be compelled to petition for termination of his parental rights. The District Court held a hearing on the petition and again extended TLC on June 20, 2003. Neither J.Q. nor his attorney appeared at the hearing. The District Court noted in its order extending TLC that J.Q.'s counsel apparently had not been served with notice of the hearing.

¶21 A Wisconsin jury convicted J.Q. on August 4, 2003, and the judge sentenced him concurrently to four years in Wisconsin state prison, followed by ten years on probation. J.Q. remained incarcerated in Wisconsin throughout the rest of the termination proceedings in Montana.

¶22 The Department finally petitioned the District Court on November 17, 2003, to terminate J.Q.'s parental rights and to grant the Department permanent legal custody of A.N.W. The petition alleged alternative bases for termination. The Department alleged

6

first that the evidence would establish that the statutory grounds for termination contained in § 41-3-609(1)(f), MCA--the child has been adjudicated a youth in need of care, a failed treatment plan, and the condition rendering the parent unfit is unlikely to change--were met. The petition also alleged that § 41-3-609(4)(c), MCA, relieved the Department of its obligation to provide J.Q. with a treatment plan due to J.Q.'s continued incarceration for more than one year. J.Q.'s continued incarceration made him unfit or unable to parent and this impediment was unlikely to change within a reasonable period due to his incarceration and thus termination would be in A.N.W.'s best interest. The Department nevertheless attached a copy of J.Q.'s treatment plan to the petition. The amended treatment plan did not comply with all of the eleven changes the District Court had set forth in its order of January 29, 2003.

¶23 The District Court scheduled a hearing on the Department's termination petition for March 11, 2004. J.Q. moved to continue this hearing date on the grounds that the treatment plan appended to the petition to terminate did not reflect accurately the changes upon which the District Court conditioned its January 29, 2003, order. The District Court denied the continuance.

¶24 J.Q. appeared via telephone from Wisconsin and his counsel appeared in person on March 11, 2004. J.Q. renewed his motion for a continuance on the same grounds as he argued previously. The Department conceded that the treatment plan attached to the termination petition contained some discrepancies from the changes the District Court had ordered in January 2003. The Department conceded further that J.Q. had not received or signed a copy of the amended treatment plan before it served the petition for

7

termination on J.Q. The Department asserted that these problems with the treatment plan proved inconsequential, however, because § 41-3-609(4)(c), MCA, rendered a treatment plan unnecessary in light of J.Q.'s continued incarceration beyond a one-year term.

¶25 The Department then withdrew its objection to J.Q.'s motion for a continuance so it could amend further the treatment plan to comply with the court's January 2003 written order and provide J.Q. a copy. The District Court continued the termination hearing until April 13, 2004. The Department filed a revised treatment plan on March 19, 2004, and informed the court that it had mailed a copy of this treatment plan to J.Q. on March 11, 2004.

¶26 The District Court proceeded with the rescheduled termination hearing on April 13, 2004. The court entered its findings of fact, conclusions of law and order that terminated J.Q.'s parental rights on July 7, 2004. The District Court found that J.Q. was incarcerated in Wisconsin on a four-year term of commitment and had been incarcerated for more than one year at the time of the termination hearing. The court further found that J.Q.'s incarceration relieved the Department of its requirement to implement a court-approved treatment plan for J.Q. based upon § 41-3-609(4)(c), MCA.

¶27 The District Court further noted that it had approved a treatment plan, subject to certain modifications, in January of 2003. J.Q. "was given ample opportunity to comply with a very reasonable treatment plan," and failed to comply with more than ten different provisions of the plan. The court also found that A.N.W. had been in foster care for over 22 months by the date of the hearing. The District Court concluded that terminating J.Q.'s parental rights was in A.N.W.'s best interests and granted permanent custody, with

8

the right to consent to adoption, to the Department.  J.Q. appeals.

## STANDARD OF REVIEW

¶28     We review a district court's findings of fact to determine whether those findings are clearly erroneous.  *In re Custody and Parental Rights of M.A.D.*, 2003 MT 10, ¶ 12, 314 Mont. 38, ¶ 12, 62 P.3d 717, ¶ 12.  We review the court's conclusions of law to determine whether the court correctly interpreted and applied the law.  *In re M.A.D.*, ¶ 12.

¶29     We review a district court's ultimate decision to terminate parental rights to determine whether the court abused its discretion.  A district court abused its discretion only if it acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice.  *In re M.A.D.*, ¶ 12.   This Court should not reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the district court. *In re A.F.*, 2003 MT 254, ¶ 24, 317 Mont. 367, ¶ 24, 77 P.3d 266, ¶ 24.

## DISCUSSION

### ISSUE ONE

¶30     Did District Court Judge Stadler's action in conducting a show cause hearing and entering an order granting the Department emergency protective services and TIA after he signed an order recusing himself invalidate the subsequent parental termination proceeding?

¶31     Judge Stadler informed the parties that he deemed himself disqualified from presiding over the initial show cause hearing because of his involvement in the earlier dissolution proceedings.   The previous day he had signed a relinquishment and acceptance order that transferred the case to Judge Curtis.  The parties' arguments focus

on the procedural consideration of when the recusal order became effective. J.Q. asserts that Judge Stadler's disqualification became effective when Judge Stadler signed it on April 11, 2002. The Department responds that Judge Stadler retained his authority to preside until the recusal order was filed three days after the hearing. We conclude that Judge Stadler's decision to preside over the hearing does not affect the disposition of this case, however, regardless of when the recusal order became effective.

¶32 We have said that "procedural defects in a temporary custody hearing do not invalidate subsequent permanent legal custody proceedings." *Matter of S.P.* (1990), 241 Mont. 190, 196, 786 P.2d 642, 646. The hearing here served to determine whether A.N.W. needed emergency protective services and to determine whether to grant TIA to the Department. The hearing did not affect A.N.W.'s permanent legal custody or J.Q.'s parental rights. The TIA and emergency protective services hearing represents an early step in the process that the Department could have circumvented. For example, § 41-3-422(1)(c), MCA, allows the Department to petition immediately for temporary legal custody without first seeking TIA. Thus, we conclude that Judge Stadler's action in conducting the TIA and emergency protective services hearing after he had recused himself does not warrant reversal in light of the fundamentally fair procedures afforded to J.Q. in the youth in need of care and termination proceedings. *See In re S.C.*, 2005 MT 241, ¶ 29, 328 Mont. 476, ¶ 29, 121 P.3d 552, ¶ 29.

## ISSUE TWO

¶33 Did the District Court afford J.Q. a fundamentally fair procedure when it ended the youth in need of care hearing before J.Q. could cross-examine the CASA volunteer and present two additional witnesses?

10

¶34    J.Q. contends that the District Court violated his due process rights when it refused to allow him to cross-examine the CASA volunteer and call two additional witnesses at the youth in need of care hearing.  A parent's right to the care and custody of a child represents a fundamental liberty interest, and consequently, the state must provide fundamentally fair procedures at all stages in the proceedings to terminate parental rights. *In re V.F.A.*, 2005 MT 76, ¶ 6, 326 Mont. 383, ¶ 6, 109 P.3d 749, ¶ 6.  Proceedings involving the termination of the parent-child relationship must meet due process requisites guaranteed by the Montana and United States Constitutions.  *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, ¶ 12, 87 P.3d 408, ¶ 12.  Fundamental fairness and due process require that a parent not be placed at an unfair disadvantage during the termination proceedings.  *In re A.S.*, ¶ 12; *Matter of A.S.A.* (1993), 258 Mont. 194, 198, 852 P.2d 127, 129; *In re A.R.,* 2004 MT 22, ¶ 11, 319 Mont. 340, ¶ 11, 83 P.3d 1287, ¶ 11.

¶35    As a practical matter, however, pre-termination hearings entitle the parent to less process than the actual termination proceedings.  In *In re A.M.,* 2001 MT 60, ¶ 50, 304 Mont. 379, ¶ 50, 22 P.3d 185, ¶ 50, we refused to extend a parent's right to court-appointed counsel to a pre-termination proceeding.  Similarly, in *Matter of A.B.* (1989), 239 Mont. 344, 348-49, 780 P.2d 622, 625, we held that parents do not have a statutory or constitutional right to appointed counsel at every stage of child protective proceedings that result in termination of parental rights.  *Compare* § 41-3-607(4), MCA (2003), (requiring appointed counsel whenever the Department actually petitions to terminate parental rights).

¶36 In *In re custody of M.W.*, 2001 MT 78, 305 Mont. 80, 23 P.3d 206, a father appealed the termination of his parental rights on the grounds that the District Court violated his due process rights when it did not allow him to challenge the State's evidence regarding his daughter's permanency plan. The father appeared without a lawyer and the court did not afford him the opportunity to question *any* witnesses or present *any* evidence concerning his child's placement. We concluded that due process did not require the court to provide the father "an opportunity to scrutinize and challenge the evidence and witnesses presented. . . ." at such a pre-termination hearing. *In re custody of M.W.*, ¶ 27.

¶37 The District Court afforded J.Q. sufficient opportunity to scrutinize and challenge the evidence at the pre-termination hearing to adjudicate A.N.W. a youth in need of care. Although the hearing concluded before J.Q. could cross-examine the CASA volunteer and present two additional witnesses, the transcript demonstrates that J.Q. dominated the day and a half hearing. The court initially scheduled the hearing for July 1, 2002, and extended it by half a day. J.Q. knew the hearing was scheduled for one day and chose to spend his time cross-examining the Department's witnesses at length. In fact, J.Q. cross-examined the witnesses for a period equal to the combined total questioning of these witnesses by the Department's counsel and A.N.W.'s counsel. The District Court did not place J.Q. at a disadvantage during the pre-termination youth in need of care proceedings.

¶38 Moreover, J.Q. fails to assert how the District Court's refusal to continue the hearing prejudiced him. He simply alleges that the District Court's action violated his due process rights. He does not allege that allowing him to call the additional witnesses

or cross-examine the CASA volunteer would provide the court any relevant information that would affect its decision. We conclude the hearing to adjudicate A.N.W. a youth in need of care constituted a fundamentally fair process. *In re V.F.A.*, ¶ 6. The District Court judge's decision to terminate the hearing after a day and a half under these circumstances does not warrant reversal. *In re S.C.*, ¶ 29.

## ISSUE THREE

¶39 Did the District Court's failure to bifurcate the dispositional hearing from the youth in need of care hearing violate J.Q.'s right to a fundamentally fair process?

¶40 J.Q. asserts that the District Court's failure to bifurcate the youth in need of care adjudication and the TLC disposition violated § 41-3-438(2), MCA. The Department does not dispute that District Court failed to bifurcate the proceedings, but maintains that the proceedings satisfied the statutory requirements because the court addressed the dispositional issues apart from adjudicatory issues. The Department asserts further that J.Q.'s failure to object to the lack of bifurcation before the District Court precludes him from raising the issue on appeal. We agree with the Department on this point.

¶41 This Court does not consider an issue presented for the first time on appeal. *In re T.E.,* 2002 MT 195, ¶ 20, 311 Mont. 148, ¶ 20, 54 P.3d 38, ¶ 20. We have determined that we will not fault a district court for failing to address statutory deficiencies that are not brought to its attention during the proceedings because doing so would encourage litigants to withhold objections rather than raise the issues appropriately in the district court. *In Re T.E.*, ¶ 23. For example, in *In re M.W.,* 2002 MT 126, 310 Mont. 103, 49 P.3d 31, we declined to address the father's argument that the district court's failure to

13

hold a permanency plan hearing within the statutory deadline denied him fundamentally fair procedures when he had not objected in the district court. J.Q. likewise did not object to the converged hearing in the District Court and we decline to consider the issue for the first time on appeal. *In re M.W.*, ¶¶ 22-23.

## ISSUE FOUR

¶42 Did the District Court improperly consider documented evidence regarding J.Q.'s parole status that the Department filed after the termination hearing's conclusion when the evidence accurately reflected J.Q.'s parole status and confirmed his parole officer's testimony at the hearing?

¶43 The Department filed a document from the Wisconsin parole commission following the conclusion of the termination proceeding that advised that J.Q. had been denied parole. J.Q. alleges that the District Court improperly considered this document in light of the fact the District Court did not "reopen the case."

¶44 J.Q.'s Wisconsin parole officer testified telephonically at the April 13, 2004, proceeding. She stated that it was "doubtful" the parole commissioner would grant J.Q. parole that month because J.Q. had not completed a pre-parole plan. The parole commissioner denied J.Q. parole after his April 28, 2004, parole hearing. The Department filed a document from the Wisconsin parole commission on May 5, 2004, reflecting J.Q.'s continued incarceration. The District Court issued its findings of fact and conclusions of law on July 6, 2004, and included in its conclusions that J.Q. "will not be paroled in April [2004]."

¶45 We fail to see--and J.Q. fails to allege--how the Department's filing of a document that reflected accurately J.Q.'s parole status in Wisconsin after the April 13, 2004,

14

termination hearing prejudiced J.Q. The fact that J.Q.'s parole officer had provided identical information at the hearing highlights the lack of prejudice to J.Q. Consequently, the District Court's actions do not warrant reversal. *In re S.C.*, ¶ 29.

## ISSUE FIVE

¶46 Do the Department's alleged failures to comply with all of the statutory and court imposed deadlines surrounding J.Q.'s treatment plan affect the disposition of the case absent a showing of prejudice to J.Q.?

¶47 J.Q. alleges three errors the Department made regarding the treatment plan involving time delays as set forth in the procedural and factual background. *See* ¶¶ 16, 19, 22-25, supra. J.Q. fails once again to demonstrate how the delays prejudiced him.

¶48 The Department did not petition to terminate J.Q.'s parental rights on the lone assertion that J.Q. failed to comply with the treatment plan. The Department premised its petition to terminate alternatively on § 41-3-609(1)(f)(i) and (ii), MCA, and § 41-3-609(4)(c), MCA. The petition to terminate J.Q.'s parental rights included both bases and thus provided J.Q. adequate notice that his prolonged incarceration represented an additional premise by which the Department sought termination.

¶49 J.Q.'s situation contrasts with *In re A.T.*, 2003 MT 154, ¶¶ 24-25, 316 Mont. 255, ¶¶ 24-25, 70 P.3d 1247, ¶¶ 24-25, where we reversed the district court's decision to terminate the incarcerated father's parental rights because the Department had failed to include § 41-3-609(4)(c), MCA, in its termination petition. J.Q.'s prolonged incarceration and the Department's inclusion of § 41-3-609(4)(c) in its termination petition provided the District Court with grounds to terminate J.Q.'s parental rights independent of his failure to comply with a treatment plan. Section 41-3-609(4)(c),

15

MCA; see also ¶ 51, infra.  As a result, we need not address errors in the treatment plans alleged by J.Q.

## ISSUE SIX

¶50    Did the District Court abuse its discretion when it terminated J.Q.'s parental rights?

¶51    The District Court must address adequately each applicable statutory requirement before it terminates an individual's parental rights.  *In re A.M.*, ¶ 34.  The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met.  *In re A.M.*, ¶ 34.  The Legislature and this Court have held consistently that the best interest of the child standard is paramount and "must take precedence over parental rights" when the District Court considers the criteria for terminating parental rights.  *In re R.T.,* 2005 MT 173, ¶ 13, 327 Mont. 498, ¶ 13, 116 P.3d 783, ¶ 13.  The court should give primary consideration to the child's physical, mental, and emotional conditions and needs when it addresses the child's best interest. Section 41-3-609(3), MCA.

¶52    The Department included §41-3-609(1)(f), MCA, in its petition to terminate J.Q.'s parental rights to A.N.W.  The petition alleged that J.Q.'s continued incarceration satisfied the statutory requirements for termination under this subsection, via application of §§ 41-3-609(4)(c) and 2(d), MCA.  The statute provides that the Department may forego a treatment plan if the "parent is or will be incarcerated for more than 1 year" and if reunification is not in the best interest of the child.  Section 41-3-609(4)(c), MCA.  J.Q. does not dispute that at the time of the termination hearing he had been incarcerated for

16

over a year, and his sentence does not end until January 2007.

¶53 J.Q. testified that he had known about the outstanding child support obligation for "almost ten years," but admitted he did nothing to prevent his incarceration. In fact, he stated "[i]f I had it to do over again I would do it exactly as I have." The District Court found in the termination proceeding that "to be available for ANW, [J.Q.] could have taken care of this responsibility in a legal manner, but instead his choice to ignore his responsibility has resulted in his being incarcerated, convicted and imprisoned."

¶54 Section 41-3-604(1), MCA, entitled "[w]hen petition to terminate parental rights required" presumes that if a child has been in foster care for 15 of the most recent 22 months, it is in the best interests of the child to terminate parental rights. J.Q. does not dispute that A.N.W. has been in her aunt and uncle's care since May 2001--a period of 56 continuous months to date.

¶55 Additional evidence abounds that terminating J.Q.'s parental rights best serves A.N.W.'s interests. J.Q. has not had significant contact with his daughter for more than five and a half years. J.Q. admittedly has been incarcerated for almost two of those years, but he has not written or called A.N.W. since June 2003. J.Q. steadfastly has resisted the Department's attempts to formulate a treatment plan to address the Department's concern regarding his past pedophilic behavior with his former step daughter. J.Q. objected to all of the Department's proposed plans on procedural grounds, even though his prolonged incarceration relieved the Department of the requirement to formulate a treatment plan. Section 41-3-609(4)(c), MCA. And J.Q. made no effort to comply with any of the provisions of the treatment plan that he did not contest.

17

¶56 A.N.W. already has experienced more turmoil than we hope most people suffer in a lifetime. By the time she was six years old, A.N.W. had lived in three households. She has endured her parents' divorce, her mother's death, and her father's incarceration. When she was five years old, A.N.W.'s male cousins further deprived her of her childhood by sexually abusing her. The sexual abuse forced A.N.W. to uproot after she had begun to bond with her maternal grandmother following her mother's death.

¶57 Despite these challenges, A.N.W. has found a secure and loving home with her maternal aunt and uncle, D.F. and N.F., in Washington. A.N.W. has integrated herself fully in that family over the past four and a half years. A.N.W. views D.F. and N.F.'s two boys as her brothers, has a half brother (an older son of R.W.) living nearby who is involved in her life, and refers to D.F. and N.F. as "mom and dad." The ten-year-old participates in Girl Scouts, soccer, and basketball. She earns good grades and her teachers' consistent praise. Five people testified at the termination hearing that remaining with her aunt and uncle best serves A.N.W.'s interest.

¶58 D.F. and N.F. first employed Dr. Klemetson to counsel A.N.W. following her mother's death. The family requested the counselor's services again around the time when reunification with J.Q. seemed likely (prior to his incarceration) due to A.N.W.'s apparent anxiety surrounding the reunification. Dr. Klemetson expressed her uneasiness at the prospect of reunifying A.N.W. with her father "given her father's past behavior."

¶59 A Department supervisor, Diane Piorek, also emphasized the need for stability in A.N.W.'s life. A.N.W.'s CASA representative – a person appointed for sole purpose of furthering A.N.W.'s best interests – similarly advocated for A.N.W. to remain where she

is: "What is in [A.N.W.'s] best interests is for her to become well adjusted and maintain the environment she's in and to have some stability."

¶60 Mary Widner, a social worker the Department assigned to A.N.W., echoed similar concerns and noted that A.N.W. "is thriving" in her present home. Finally, Kori Taylor, the Department's social worker most recently assigned to the case, emphasized the potential irreparable effects of removing A.N.W. from the life she has made with her new family:

> [b]ecause although she has the love, security and stability within this – within this family unit – or the love and stability, the nurturing and the care, she doesn't have the security to know that this is where she's gonna stay. And that – even if he's offered the opportunity to work a treatment plan, we're looking at a considerable period of time before that can even start and take place, and then a considerable amount of time that it would take for him to complete that plan. And she's already waited for this security of permanency for three, four years.

¶61 The abundant testimony that maintaining her current placement serves A.N.W.'s physical, mental, and emotional conditions and needs provides substantial evidence that the District Court did not act arbitrarily or without conscientious reason when it terminated J.Q.'s parental rights. Moreover, the uncontroverted facts that J.Q.'s sentence runs until 2007, and that A.N.W. has been in foster care for more 56 consecutive months, provide clear and convincing evidence that the Department has met the statutory criteria for termination. The District Court did not abuse its discretion when it terminated J.Q.'s parental rights.

¶62 Affirmed.

/S/ BRIAN MORRIS

19

We Concur:

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM RICE

Justice Jim Rice specially concurring.

¶63    I join the Court=s opinion and offer the following as additional grounds for affirming the District Court.

¶64    Regarding Issue 1, Appellant offered no authority in support of his argument. Appellant advanced about one page of argument and offered as authority only a citation to *Daniels v. Thomas, Dean & Hoskins, Inc.* (1990), 246 Mont. 125, 804 P.2d 359, for the minor point that jurisdiction cannot be conferred by stipulation. This Court has repeatedly held that such briefing is a violation of the appellate rules and has enforced the rules by refusing to take up unsupported arguments. As we recently stated:

> [Peterson] advances no authority under which these asserted facts would constitute sufficient prejudice to warrant reversal, however. Rule 23(a)(4),

20

> M.R.App.P., requires an appellant to support arguments with citations to the record and to relevant authorities; an appellant cannot meet the burden of establishing error absent such citations. *See State v. Bailey*, 2004 MT 87, ¶ 26, 320 Mont. 501, ¶ 26, 87 P.3d 1032, ¶ 26 (citation omitted).
>
> . . . .
>
> Alternatively, Peterson asserts a defendant's constitutional right to due process is violated when the prosecution fails to produce relevant documents that could be used to cross-examine key government witnesses. He cites *Davis v. Alaska* (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, and *Kyles v. Whitley* (1995), 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490, in support of this assertion, but neither discusses nor applies those cases to the present case. It is not this Court's obligation to develop parties' arguments for them. *State v. Flowers*, 2004 MT 37, ¶ 44, 320 Mont. 49, ¶ 44, 86 P.3d 3, ¶ 44 (citation omitted).

*City of Billings v. Peterson*, 2004 MT 232, ¶¶ 36, 45, 322 Mont. 444, ¶¶ 36, 45, 97 P.3d 532, ¶¶ 36, 45. Our criticism of Peterson—failing to cite "relevant authorities . . . an appellant cannot meet the burden of establishing error absent such citations"; "[h]e cites [cases] in support of this assertion, but neither discusses nor applies those cases to the present case"; and "[i]t is not this Court's obligation to develop parties' arguments for them" with regard to his due process argument—are even more applicable to J.Q. than it was to Peterson.

¶65    The same principle applies with regard to Appellant's argument under Issue 2, as Appellant has cited no authority whatsoever, offering only that he "was denied fundamental due process." We have commonly applied Rule 23's requirement of developed arguments supported by authority even more fastidiously to constitutional issues. *See, e.g.*, *Peterson*, ¶ 45; *Estate of Spencer*, 2002 MT 304, ¶ 20, 313 Mont. 40, ¶ 20, 59 P.3d 1160, ¶ 20 (court declined to address "violation of constitutional due process" when the argument was not sufficiently developed). We addressed an almost identical situation in *State v. Fina* (1995), 273 Mont. 171, 902 P.2d 30:

> No analysis or authority is presented to support this particular contention. Fina also asserts parenthetically that Anderson's statements were "hardly hearsay;" again, no analysis or authority is advanced for this assertion. *Similarly, Fina's statement that "we believe [the restriction on cross-examination] impairs the due process rights of George Fina" is unsupported by analysis or authority as required by Rule 23(a)(4), M.R.App.P. Counsel's general statement that the District Court erred in this regard, "based upon case decisions cited in this section of our brief," is totally inadequate* to permit this Court to address the issue as raised, given that "this section" of Fina's brief is seventeen pages in length and addresses seven subissues.

*Fina*, 273 Mont. at 181, 902 P.2d at 36 (emphasis added). J.Q's argument offers no more than *Fina*'s passing reference to an impairment of a constitutional right. Thus, the Court would be justified by treating it in the same manner and declining to take up this issue as well, affirming the District Court.

/S/ JIM RICE

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶66 I concur in portions of the Court's opinion in this matter, but respectfully dissent from other portions and from the result the Court reaches. Because it is my view that the District Court violated J.Q.'s due process rights at the hearing in July of 2002, I would conclude under Issue Two that the District Court erred in adjudicating A.N.W. a youth in need of care. As a result, I would further conclude in Issue Six that the Department did not establish the § 41-3-609(1)(f), MCA, criteria for terminating parental rights. On that basis, I would hold that the District Court erred in terminating J.Q.'s parental rights and reverse.

22

¶67 I concur in the Court's resolution of Issues Three, Four and Five. With regard to these issues, I write primarily to express my continuing frustration with the Department's—and trial courts'—failures to comply with the explicit statutory mandates set forth by the Montana Legislature for the conduct of abuse and neglect proceedings. At the outset, I observe that the record in this case reveals numerous instances of the Department's failure to abide by court-imposed deadlines for the filing of documents and reports and the District Court's failure to require it to comply. While I am aware that the Department handles a large number of abuse and neglect cases, the timely disposition of these cases is of vital importance in protecting the rights of both children and parents. Timeliness is of special import for parents involved in these cases when viewed in light of § 41-3-604(1), MCA, which provides that, when a child has been in foster care under the custody of the Department for 15 of the most recent 22 months, "the best interests of the child must be presumed to be served by termination of parental rights." In my view, it is exceedingly unfair to a parent for the Department to drag its feet during pre-termination phases of a case involving an allegedly abused and neglected child, and then rely on § 41-3-604(1), MCA, to argue that termination of parental rights is in the best interests of the child.

¶68 Furthermore, the Department does not dispute that it requested—in a single petition—that the District Court adjudicate A.N.W. a youth in need of care and grant it TLC, and that the District Court conducted one hearing on both the adjudicatory and dispositional issues without properly structuring the hearing to address the issues separately. Indeed, the Department implicitly concedes that it and the District Court

failed to ensure that "[t]he hearing process [was] scheduled and structured so that dispositional issues are specifically addressed apart from adjudicatory issues," as required by § 41-3-438(2)(a), MCA. It contends, however, that "[a]lthough the court did not specifically bifurcate the hearing on the [Department's] petition . . . [,] the hearing addressed those issues relevant to disposition."

¶69 Such an argument ignores both the mandatory requirements established by the Montana Legislature for the conduct of hearings on the adjudicatory and dispositional phases of an abuse and neglect proceeding, and the Department's obligation to ensure that these cases are conducted in strict compliance with those statutory requirements. Such an argument also ignores repeated warnings by this Court that the statutory requirements must be met. *See, e.g.*, *Matter of F.H.* (1994), 266 Mont. 36, 40, 878 P.2d 890, 893; *Inquiry into M.M.* (1995), 274 Mont. 166, 174, 906 P.2d 675, 680. Sadly, the Department's argument here continues the same untenable, but apparently intransigent, attitude toward these cases that I have noted in prior cases. *See, e.g.*, *In re S.C.*, 2005 MT 241, ¶ 50, 328 Mont. 476, ¶ 50, 121 P.3d 552, ¶ 50 (Gray, C.J., concurring and dissenting) ("we continue to 'caution' [the Department] about compliance with the law. Our cautions apparently fall on deaf ears"); *Inquiry into M.M.*, 274 Mont. at 178, 906 P.2d at 682 (Gray, J., dissenting) ("[o]ne can hardly say that [the Department] has heeded our strong condemnation and stern warning[s]"); *Matter of F.H.*, 266 Mont. at 42, 878 P.2d at 894 (Gray, J., dissenting) ("where we previously have warned [the Department's] predecessor agency regarding its failure to comply with the law, I cannot agree with the

24

Court that it is sufficient to characterize [the Department's] conduct as unconscionable and issue another warning").

¶70 That said, however, it is clear from the record that J.Q. failed to object in the District Court to the failure to hold a bifurcated hearing and I abide by our well-established rule that we do not address issues on appeal which were not raised in the trial court. Consequently, I join in the Court's refusal to address the substantive merits of Issue Three, adding a fervent hope that the enactment of § 41-3-425, MCA (providing for the right to counsel in all proceedings involving any petition filed pursuant to § 41-3-422, MCA), and the Montana Public Defender Act will result in better representation for parents, thereby finally forcing the Department and the trial courts to follow the law. I also join the Court's opinion on Issues Four and Five, because J.Q. has failed to establish that the alleged errors raised therein resulted in prejudice to him.

¶71 With regard to Issue One, however, I would address the parties' arguments relating to whether Judge Stadler had authority to conduct the show cause hearing and enter the subsequent order granting the Department TIA, and conclude that he did not. It is my view that a discussion of this issue is appropriate in light of the disadvantage placed on parents in such a situation by having to choose between going forward with a hearing before a judge who has expressed a bias or prejudice sufficient to disqualify him or her from presiding over the case or stipulating to a continuance which will further delay resolution of the proceeding. Moreover, while I ultimately agree with the Court that this issue is not dispositive of this case, addressing the issue here will provide guidance to the district courts and counsel in addressing matters of judicial disqualification.

25

¶72 Judge Stadler deemed himself disqualified from presiding over this case and signed a relinquishment and acceptance order the day before the show cause hearing; Judge Curtis also signed the order accepting jurisdiction over the case the day before the hearing. The parties dispute the point at which Judge Stadler's order became effective— upon the signing of the order or upon the filing of the order with the clerk of court.

¶73 We have held that, for purposes of commencing time periods in which parties to a case must take further action, a judgment or order takes effect from the date on which it is filed with the clerk of court. *Firefighters, Local No. 8 v. District Court*, 2002 MT 17, ¶ 18, 308 Mont. 183, ¶ 18, 40 P.3d 396, ¶ 18. However, the filing of a judgment or order by the clerk of court is merely a ministerial function and does not affect the validity of the court's ruling. *Firefighters, Local No. 8*, ¶¶ 17-18. As a result, a district court's judgment or order is effective and binding on the parties from the time it is rendered by the court. *Firefighters, Local No. 8*, ¶ 18. As such an order is binding on the parties, so must it be binding on the judge who renders it.

¶74 "It is the policy of our system that no judge should be allowed to sit when he is laboring under bias or prejudice toward one or more of the parties litigant." *In re Woodside-Florence Irr. Dist.* (1948), 121 Mont. 346, 353, 194 P.2d 241, 245. In furtherance of this policy, Montana law provides procedures by which a judge may be disqualified from presiding over a case either upon motion of a party or by the judge *sua sponte*. *See, e.g.,* §§ 3-1-803 through -805, MCA. Where a party moves to disqualify a judge under § 3-1-805, MCA, the judge is without authority to act further in any judicial capacity except to complete certain ministerial duties. We further have stated that "by

26

analogy and by necessity we think that there could be no more power left in the judge who makes the call [to recuse] voluntarily in the one case than if he were deprived of jurisdiction by the filing of an affidavit of prejudice." *State ex rel. Moser v. Dist. Court* (1944), 116 Mont. 305, 314, 151 P.2d 1002, 1007. Thus, where a judge is disqualified from a case—either *sua sponte* or by motion of a party—any subsequent judgment rendered by that judge in the case is null and void. *See Woodside-Florence*, 121 Mont. at 356, 194 P.2d at 246.

¶75   I would conclude that Judge Stadler's *sua sponte* recusal was effective when he signed the relinquishment and acceptance order—and another judge assumed jurisdiction—on April 11, 2002. From that point, he had no power or authority to sit or act in judgment on the case. I would further conclude, therefore, that Judge Stadler's subsequent order granting the Department emergency protective services and TIA was null and void. However, the absence of a court order granting TIA does not preclude the Department from subsequently petitioning for TLC or termination of parental rights. *See* §§ 41-3-422(1)(c) and (d), MCA. Consequently, I agree with the Court that Judge Stadler's lack of authority to preside over the show cause hearing and grant the Department TIA is not dispositive of this case.

¶76   I strenuously disagree, however, with the Court's statement at the end of ¶ 32 that reversal of this case is not warranted "in light of the fundamentally fair procedures afforded to J.Q. in the youth in need of care and termination proceedings." This leads directly to my fundamental disagreement with the Court's overall resolution of this case. In this regard, I dissent from the Court's determination in Issue Two that J.Q. received

27

fundamentally fair procedures at the hearing to adjudicate A.N.W. a youth in need of care. In my view, the District Court violated J.Q.'s due process rights when it ended the hearing without allowing him to cross-examine the CASA volunteer or present testimony from two of his witnesses, and this due process violation requires reversal of the District Court's youth in need of care adjudication.

¶77 I begin by agreeing entirely with the Court's statements in ¶ 34 that a natural parent's right to the care and custody of his or her child is a fundamental liberty interest which must be protected by fundamentally fair procedures during all stages in proceedings involving the termination of the parent/child relationship. *See, e.g., In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, ¶ 12, 87 P.3d 408, ¶ 12; *In re B.N.Y.*, 2003 MT 241, ¶ 21, 317 Mont. 291, ¶ 21, 77 P.3d 189, ¶ 21. Consequently, proceedings involving the termination of the parent/child relationship must meet the requisites of due process as guaranteed by the Montana and United States Constitutions, which require that a parent not be placed at an unfair disadvantage during the proceedings. *In re A.S.*, ¶ 12; *In re B.N.Y.*, ¶ 21.

¶78 I disagree, however, with the remainder of the Court's approach to, and resolution of, Issue Two. The Court begins by observing that we have held a parent has neither a statutory nor constitutional right to appointed counsel during pre-termination phases of abuse and neglect proceedings. While this may be true, J.Q. does not raise an appointment of counsel argument and, thus, the cases cited by the Court have no application here.

28

¶79 The Court also observes that we have held parents do not have a due process right to scrutinize and challenge the evidence presented by the Department at a permanency plan hearing. *See In re M.W.*, ¶ 27. In the same paragraph as cited by the Court for this proposition, however, we further stated that "the issue of a child's placement is separate from the issue of terminating parental rights." *In re M.W.*, ¶ 27. A permanency plan hearing does not relate to, or result in an adjudication on, issues concerning a person's capabilities to parent a child, and does not require the same degree of due process considerations as is required in other phases of a termination proceeding.

¶80 Due process requires fundamental fairness which, in turn, requires fair procedures. *In re B.N.Y.*, ¶ 21. Thus, due process requires notice of an action which may deprive a person of a liberty interest and the opportunity to be heard regarding that action. *See State v. Niederklopfer*, 2000 MT 187, ¶ 10, 300 Mont. 397, ¶ 10, 6 P.3d 448, ¶ 10. This includes the opportunity to be heard at a meaningful time and in a meaningful manner. *Smith v. Board of Horse Racing*, 1998 MT 91, ¶ 11, 288 Mont. 249, ¶ 11, 956 P.2d 752, ¶ 11. The due process guarantee requires that a person be given an opportunity to explain, argue and rebut any information which may lead to the deprivation of a liberty interest. *Bauer v. State*, 1999 MT 185, ¶ 22, 295 Mont. 306, ¶ 22, 983 P.2d 955, ¶ 22.

¶81 We all agree that, as a parent, J.Q. has a fundamental liberty interest in the care and custody of his child, A.N.W. As a result, he was entitled to procedural due process during the course of these abuse and neglect proceedings which involved a potential deprivation of his liberty interest as a parent. In other words, he was entitled to the opportunity to explain, argue and rebut information produced by the Department. When

the District Court concluded the youth in need of care proceeding without allowing J.Q. to cross-examine the CASA volunteer or present testimony from two of his witnesses, it denied J.Q. the opportunity to do so, denied him a fundamentally fair procedure and, therefore, denied him his right to due process.

¶82    The Department argues that, even if the District Court erred in this regard, the error was harmless in light of the ample evidence that A.N.W. should be adjudicated a youth in need of care, because the error occurred early in the proceeding, and because J.Q. was given the opportunity to examine the Department's witnesses and call his witnesses at the final termination hearing.  The Department's arguments constitute yet another sad commentary on its approach to abuse and neglect proceedings, in that they totally ignore the import of a district court's adjudication that a child is a youth in need of care.  For example, the Department may not require a parent to complete a treatment plan unless a district court adjudicates the child a youth in need of care.  *See* § 41-3-443(1)(c), MCA.  Such an adjudication is a prerequisite for granting the Department TLC.  *See* § 41-3-442(1), MCA.  Additionally, a youth in need of care adjudication is a threshold requirement for a court to terminate parental rights pursuant to § 41-3-609(1)(f), MCA, which is the most common basis on which the Department petitions for termination of parental rights.  Clearly, a youth in need of care adjudication is a critical juncture in an abuse and neglect proceeding which requires fundamentally fair procedures.  J.Q. did not receive fundamentally fair procedures at the adjudicatory hearing in this case and such error was not harmless.

¶83 Furthermore, the Montana Legislature requires district courts to give highest preference to abuse and neglect cases when scheduling hearing dates. *See* § 41-3-422(3), MCA. Thus, notwithstanding other cases on the docket, except perhaps criminal cases subject to speedy trial limits, courts are required to give priority to abuse and neglect proceedings to ensure a parent the opportunity to be heard at a meaningful time and in a meaningful manner with regard to the liberty interest at stake. When the District Court ended the adjudicatory hearing on the second day, the court denied J.Q.'s request to cross-examine the CASA volunteer and present additional witnesses by stating:

> Nope. We have used about four more hours for this hearing than we had set aside for it, and [the] Court has another hearing in less than an hour, and the [C]ourt and staff wants lunch, so that's the way it's going to be.

When J.Q. further objected to the District Court ending the hearing before he could present his entire case, the court stated that "the fact of the matter is this hearing was scheduled for a period of one day. The fact of the matter is it's taken a day and a half, and that's all I have." In my view, by denying J.Q. the ability to cross-examine the CASA volunteer and present the testimony of his witnesses, the District Court failed to give the youth in need of care hearing the priority required by law, thereby failing to ensure J.Q. the opportunity to be heard at a meaningful time and in a meaningful manner.

¶84 I would conclude that the District Court violated J.Q.'s right to procedural due process at the hearing to adjudicate A.N.W. a youth in need of care. Consequently, I would reverse the District Court's youth in need of care adjudication, and I dissent from the Court's failure to do so.

31

¶85 Finally, because it is my view that the District Court erred in adjudicating A.N.W. a youth in need of care based on its violation of J.Q.'s due process rights at the hearing, I also must dissent from the Court's holding in Issue Six that the District Court did not abuse its discretion in terminating J.Q.'s parental rights.

¶86 The Department petitioned to terminate J.Q.'s parental rights based on § 41-3-609(1)(f), MCA, which provides that the district court may order the termination of parental rights upon a finding that

> the child is an adjudicated youth in need of care and both of the following exist:
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.

The Department contended that the statutory requirements for termination were met because J.Q. had failed to comply with his court-approved treatment plan and, pursuant to § 41-3-609(2)(d), MCA, the conduct or condition rendering J.Q. unfit to parent was unlikely to change within a reasonable time as a result of his present judicially ordered long-term confinement. The Department also argued, in the alternative, that the treatment plan required by § 41-3-609(1)(f)(i), MCA, was not necessary pursuant to § 41-3-609(4)(c), MCA, because of J.Q.'s continued incarceration in Wisconsin. The District Court agreed and terminated his parental rights on both bases.

¶87 It is well-established that "[t]he adjudication of a child as a youth in need of care is a threshold requirement without which a court may not . . . terminate a person's parental rights under" § 41-3-609(1)(f), MCA. *In re B.N.Y.*, ¶ 22. This is true even where a

treatment plan is not required pursuant to § 41-3-609(4)(c), MCA, because § 41-3-609(4)(c), MCA, negates the treatment plan portion of § 41-3-609(1)(f)(i), MCA, but *not* the threshold requirement that the child be adjudicated a youth in need of care in § 41-3-609(1)(f), MCA.

¶88　As stated above, it is my view that the District Court violated J.Q.'s due process rights at the adjudicatory hearing by failing to afford him a full opportunity to be heard and a fundamentally fair procedure. Therefore, the court's order adjudicating A.N.W. a youth in need of care should be reversed. Absent a valid youth in need of care adjudication, the District Court could not terminate J.Q.'s parental rights pursuant to § 41-3-609(1)(f), MCA. As a result, I would conclude that the District Court erred in determining the Department had met its burden of satisfying the criteria for termination set forth in § 41-3-609(1)(f), MCA, and hold that the District Court abused its discretion in terminating J.Q.'s parental rights.

¶89　I would reverse. I dissent from the Court's failure to do so.


/S/ KARLA M. GRAY


Justice James C. Nelson joins in the foregoing concurring and dissenting opinion of Chief Justice Karla M. Gray.

/S/ JAMES C. NELSON