No. 04-597

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 67

IN THE MATTER OF THE CUSTODY AND
THE PARENTAL RIGHTS OF C.J.K.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark, Cause No. ADN 2003-24
The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Jeremy Gersovitz, Assistant Public Defender, Stephanie Berens, Assistant
Public Defender, Helena, Montana

    For Respondent:

        Honorable Mike McGrath, Montana Attorney General, Mark W. Mattioli,
Assistant Attorney General, Helena, Montana; Leo Gallagher, Lewis and
Clark County Attorney, Carolyn Clemens, Deputy County Attorney, Helena,
Montana

Submitted on Briefs:   February 8, 2005

Decided:  March 22, 2005

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 T.K., the biological mother of C.J.K., appeals the First Judicial District Court's Order terminating her parental rights. We affirm.

**ISSUE**

¶2 T.K. presents the following issue on appeal:

Did the District Court abuse its discretion when it concluded the conduct or condition that rendered T.K. an unfit parent was unlikely to change within a reasonable time?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 C.J.K. was born in December 2000. The identity of C.J.K.'s birth father is not known. His young mother, T.K., was 21 years old at the time. T.K. admits that she began using methamphetamine when she was 22. She also admits to using marijuana and alcohol since ages 17 and 18 respectively.

¶4 On June 11, 2003, T.K. and her then-boyfriend, J.H., had a domestic dispute. C.J.K. was present for this violent altercation that left T.K. with two black eyes. The following day, the situation deteriorated further, and T.K. called the police. On June 13, the Lewis and Clark County Department of Public Health and Human Services, Child and Family Services Division (DPHHS), arrived to investigate. T.K. reported that J.H. was physically abusive to C.J.K., and on June 11 held him by his ankles and put his head in a creek. He also tricked C.J.K. into drinking beer and refused to let the child eat.

¶5 C.J.K. was examined by a pediatrician. The doctor determined that he had numerous bruises over his spine and thighs, among other places. He also had a supraorbital fracture

2

over his left eye. During C.J.K.'s medical examination, T.K. reported to a detective and a social worker that J.H. had been being abusive to both her and C.J.K. for approximately two months.

¶6 On July 8, 2003, DPHHS filed a petition for temporary investigative authority (TIA), protective services and youth in need of care designation for C.J.K. A hearing was held on the Petition on August 18 and 20, 2003, at which time T.K. stipulated to the relief requested. C.J.K. was placed in foster care. T.K. and her social worker with Family and Children Services developed a treatment plan and the District Court approved the plan on September 10, 2003.

¶7 Under T.K.'s treatment plan, T.K. was to establish a safe and healthy environment for C.J.K. She was also to undergo a chemical dependency evaluation and submit to random drug testing through Drug Information Systems (DIS). A specific procedure for daily contact with DIS was developed. T.K. understood that failure to follow the procedure could result in a "failed" test. T.K. underwent random testing and intensive outpatient therapy from September until December 18, 2003, but because she continued using drugs resulting in positive/failed urine tests, she was referred for inpatient treatment at Montana Chemical Dependency Center (MCDC) in Butte. She completed this program on January 29, 2004, and returned to Helena to resume the intensive outpatient program and random testing. However, the following day, she tested positive with extremely high levels of amphetamine or methamphetamine.

3

¶8    From September 2003 until December 2003, when she entered MCDC, T.K. failed to show up for eleven tests which were considered "failed" tests, and had two positive tests. From January 2004 until March 9, 2004, she missed five testing calls which were considered "failed" tests, and had three positive tests.

¶9    Throughout her treatment, T.K. intermittently recognized she had a drug problem but more often was unwilling to admit to her addiction or admit that she had relapsed into drug usage. Also, she was frequently uncooperative with her treatment team.

¶10    For several months prior to the termination hearing, T.K. was living in housing provided by the Helena Housing Authority (HHA). As a resident of such housing, T.K. was required to comply with certain rules. For purposes of this case, one such requirement was that she maintain her apartment in a healthy and safe manner and consent to an annual inspection of the premises. T.K. failed her 2003 inspection, which was conducted at some time after C.J.K. had been removed from the home; therefore, she was placed on a monthly inspection schedule. She subsequently failed the following eight monthly inspections. An HHA representative testified that T.K.'s unit was so dirty and messy that HHA inspectors could not reach windows to conduct a safety check and could not even get into C.J.K.'s bedroom.

¶11    In addition to establishing a safe and healthy environment for herself and C.J.K. and addressing her addiction issues, T.K.'s treatment plan required her to attend parenting classes. T.K.'s counselor testified that he had suggested that T.K. postpone parenting classes until she returned from MCDC in order to allow her to concentrate on her serious addiction

4

concerns. The testimony was undisputed that during the seven to eight months that T.K. was subject to the treatment plan, she took no parenting classes.

¶12 On February 18, 2004, T.K. stipulated to a six-month extension of her treatment plan which was approved by the District Court on the same day. On April 1, 2004, DPHHS filed its Petition to Terminate T.K.'s parental rights. A hearing on the Petition was held on April 30, 2004, and on June 24, 2004, the District Court granted the Petition and terminated T.K.'s rights. T.K. filed a timely appeal.

## STANDARD OF REVIEW

¶13 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re J.V.*, 2003 MT 68, ¶ 7, 314 Mont. 487, ¶ 7, 67 P.3d 242, ¶ 7 (citation omitted). The test for an abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *In re K.C.H.*, 2003 MT 125, ¶ 11, 316 Mont. 13, ¶ 11, 68 P.3d 788, ¶ 11 (citation omitted). However, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *J.V.*, ¶ 7 (citation omitted). To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. We review those findings of fact to determine whether they are clearly erroneous. Lastly, we review the court's conclusions of law to determine whether the court interpreted the law correctly. *J.V.*, ¶ 7.

5

¶14 The district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children. Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights. Section 41-3-609(3), MCA. Moreover, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met. *J.V.*, ¶ 8 (internal citation omitted).

## DISCUSSION

¶15 To terminate a parent-child relationship, a district court must determine that one of the criteria in § 41-3-609, MCA, exists. *Matter of M.J.W.*, 1998 MT 142, ¶ 16, 289 Mont. 232, ¶ 16, 961 P.2d 105, ¶ 16. The sections of this statute relevant to this case are:

> (1) The court may order a termination of the parent-child legal relationship upon a finding . . . that any of the following circumstances exist:
>
> . . .
>
> (f) the child is an adjudicated youth in need of care and both of the following exist:
>
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
>
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.
>
> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate

6

parental care. In making the determinations, the court shall consider but is not limited to the following:

(a) emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time;

(b) a history of violent behavior by the parent;

(c) excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child; and

(d) present judicially ordered long-term confinement of the parent.

(3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child.

¶16 T.K. asserts that the District Court erred when it found that she was responsible for abuse of C.J.K. because the evidence shows that only J.H. abused C.J.K. She also argues that she should not be held responsible for failing to attend parenting classes because her social worker had encouraged her to postpone such classes while she worked on her addiction problems.

¶17 The District Court found that "[t]he State's first concern was [C.J.K.'s] physical safety, and both [T.K.] and her boyfriend's abuse of the child." The court further found that "[i]f [C.J.K.] were to be returned to [T.K.] at this time or at any time in the foreseeable future, the results would be disastrous to [C.J.K.] He would almost certainly continue to be abused and neglected."

¶18 Under § 41-3-102(7)(b)(i)(A), MCA, the term "child abuse or neglect" includes "actual physical or psychological harm to a child or substantial risk of physical or

7

psychological harm to a child by the acts or *omissions* of a person responsible for the child's welfare." (Emphasis added). It is undisputed that T.K. was the person responsible for C.J.K.'s welfare. It is also undisputed that she allowed J.H. to physically and psychologically abuse C.J.K. for over two months and did not terminate the relationship with J.H. or seek a restraining order against him. In fact, while J.H. was in jail for abusing C.J.K., she wrote him letters professing love and offering to do whatever she could to help him.

¶19 T.K. admitted that while she was still seeing J.H., C.J.K. was so frightened of him that he would start shaking and crying when J.H. entered a room and would run and hide. T.K. claims that she has since severed her relationship with J.H.

¶20 In addition to her failure to protect C.J.K. from J.H., there was convincing testimony that even though she had received food vouchers for herself and C.J.K., on at least one occasion she failed to feed C.J.K. until 4:30 in the afternoon. In the face of such testimony, we conclude that the District Court's characterization of T.K.'s "abuse" of her son is not clearly erroneous.

¶21 Likewise, we conclude that the District Court's finding that "[d]uring the seven months of the treatment plan, [T.K.] never did participate in parenting classes, even after her return from MCDC" is fully supported by the evidence and not erroneous. While T.K. argues that she should not be held responsible for failing to take these classes, compliance with her treatment plan is clearly her responsibility. T.K. had 13.5 years of education and has adequate intellectual skills and intelligence to understand the terms of her treatment plan.

While her counselor suggested that she initially address her addiction issues and attend parenting classes upon her return from MCDC, she, nonetheless, led him to believe she was pursuing such classes. Moreover, upon her return from MCDC in January, she failed to enroll in or pursue such classes. The court's finding, therefore, that she did not participate in parenting classes for seven months is undisputed and is not clearly erroneous.

¶22 T.K. also claims that the District Court erred when it concluded that the conduct or condition that rendered her unable to adequately care for C.J.K was unlikely to change within a reasonable time. As indicated above, the likelihood that a parent's conduct or condition is going to change in a reasonable amount of time is an element of the statutory criteria for termination of parental rights. See § 41-3-609(1)(f), MCA.

¶23 In the case before us, C.J.K. had been adjudicated a youth in need of care and the court had heard substantial evidence that T.K. had not complied with her treatment plans. These factors alone, however, are insufficient to terminate parental rights and it is mandatory that § 41-3-609(1)(f)(ii), MCA, be met as well.

¶24 T.K. maintains that she availed herself of the services necessary to achieve reunification with her son and she actively involved herself in her treatment plan, making substantial efforts to comply with it. She argues that because she is addicted to "one of the most addictive drugs" in existence, she should be given more time to overcome her addiction. T.K.'s argument, unfortunately, tends to support rather than overcome termination of her rights. The District Court heard substantial testimony about the difficulty associated with overcoming methamphetamine addiction. It also heard considerable

9

testimony from various sources outlining T.K.'s repeated failure to comply with her drug program or to even make acceptable progress despite extensive assistance. The court heard expert testimony that, given T.K.'s consistent inability to remain drug-free, the prospects of T.K. overcoming her addiction within a "reasonable time" is unlikely. As we have stated on previous occasions, because we cannot see into the future to determine whether a parent's conduct is likely to change, that determination must, to some extent, be based on the parent's past conduct. *In re M.R.G.*, 2004 MT 172, ¶ 31, 322 Mont. 60, ¶ 31, 97 P.3d 1085, ¶ 31 (citations omitted). In the case before us, the District Court concluded that the condition rendering her unfit to parent C.J.K. was unlikely to change within a reasonable time. We conclude the court's findings were not clearly erroneous and the District Court did not abuse its discretion.

## CONCLUSION

¶25    For the foregoing reasons, we affirm the District Court.

/S/ PATRICIA O. COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE