No. 05-736

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 281

IN RE THE MATTER OF A.S.,

Youth in Need of Care.

APPEAL FROM:     The District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DN 2002-23,
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Kirsten Mull Core, Kirsten Mull Core, P.C., Bozeman, Montana

For Respondent:

Hon. Mike McGrath, Montana Attorney General, Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

Marty Lambert, Gallatin County Attorney, Kimberly P. Dudik,
Deputy County Attorney, Elizabeth Ridenour, Deputy County
Attorney, Bozeman, Montana

For Guardian ad Litem:

Leslie Taylor, Attorney at Law, Bozeman, Montana

Submitted on Briefs:  May 17, 2006

Decided:  October 31, 2006

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      S.B., the mother of A.S., appeals the termination of her parental rights to A.S. by the District Court for the Eighteenth Judicial District, Gallatin County.  We affirm.

¶2      We address the following issues on appeal:

¶3      1.  Whether the District Court properly adjudicated A.S. as a youth in need of care.

¶4      2.  Whether the District Court's findings of fact were clearly erroneous.

¶5      3.  Whether the District Court abused its discretion in terminating S.B.'s parental rights.

## Factual and Procedural Background

¶6      A.S. was born on September 4, 2001, to S.B., the mother, and S.S., the father.[1] When A.S. was about three months old, the Department of Public Health and Human Services (DPHHS) removed A.S. from her parents' care when it concluded that S.B. and S.S. were cooking methamphetamine (meth) in the room across from A.S.'s bedroom. As a result, both S.B. and S.S. were charged with drug offenses and DPHHS was given temporary legal custody of A.S.   After S.B. successfully completed her treatment plan, DPHHS returned A.S. to her care and the District Court granted DPHHS's motion to dismiss the Petition for Temporary Legal Custody.

¶7      On October 10, 2002, DPHHS filed a second Petition for Emergency Protective Services, Adjudication as a Youth in Need of Care and Temporary Legal Custody of A.S. This second petition was based upon an October 9, 2002 referral from the Missouri River Drug Task Force.   Law enforcement officers from the task force had conducted a

---

[1]  This appeal involves the termination of only S.B.'s parental rights to A.S.

2

probationary search of S.B.'s residence and discovered bindles of meth in the bedroom, a digital scale, empty paper bindles, paper used to make bindles, and 3.2 grams of meth on S.B.'s person. A.S., who was only thirteen months old, was at home with S.B. at the time of the search. Officers arrested S.B. and charged her with Criminal Possession of Dangerous Drugs with Intent to Distribute. Consequently, at the time DPHHS filed for temporary legal custody of A.S., S.B. was in the Gallatin County Detention Center and S.S. was incarcerated at the Montana State Prison.

¶8 The District Court entered an Order for Immediate Protection, appointed an attorney for S.B. and a guardian ad litem for A.S. The court also scheduled a show cause hearing for October 22, 2002. According to a report prepared by the guardian ad litem, S.B. admitted that she had been using meth for about six weeks prior to her arrest. She also admitted that she intended to use the drugs the officers found in her possession.

¶9 The court record reflects that at the October 22, 2002 show cause hearing, S.B. stipulated that there was probable cause for the court to leave the emergency petition in place. Hence, the court entered an order in which it found that there was probable cause to believe that A.S. was abused or neglected or in danger of being abused or neglected.

¶10 Even though the court scheduled an adjudicatory hearing for January 8, 2003, the next hearing actually occurred on November 26, 2002. Because this hearing was labeled as a "dispositional" hearing, the judge inquired of the parties if there had been "some agreement regarding the adjudicatory nature in this matter." Counsel for DPHHS responded that there had been and that she had a treatment plan for the court's consideration. Neither S.B. nor her counsel objected. The judge asked S.B.'s counsel if

he had an opportunity to review the treatment plan with S.B. and counsel responded that he had. Counsel also stated that S.B. admitted that she had been using meth prior to her arrest. The judge subsequently approved the treatment plan and S.B. signed it.

¶11 On November 29, 2002, the District Court filed an Order of Adjudication and Disposition, wherein it adjudicated A.S. as a youth in need of care; awarded DPHHS temporary legal custody of A.S. for six months; and scheduled a review hearing for January 8, 2003.

¶12 By the time of the January 8, 2003 review hearing, S.B. had completed a chemical dependency evaluation and was awaiting inpatient treatment and sentencing in her criminal case. Because of the uncertainty of S.B.'s situation, the review hearing was postponed several times and DPHHS continued to have temporary legal custody of A.S.

¶13 On March 6, 2003, DPHHS reported that S.B. was in treatment at the Montana Chemical Dependency Center (MCDC). S.B. subsequently completed her treatment at MCDC and returned to the Park County Recovery House.

¶14 On May 30, 2003, S.B. appeared with counsel and explained that she received a suspended sentence for her recent drug conviction. She stated that she had completed inpatient chemical dependency treatment; that she was participating in outpatient treatment; and that she had been sober for eight months. DPHHS requested that the court extend its temporary legal custody of A.S. and approve an amended treatment plan for S.B. S.B. objected to the portion of the amended treatment plan that required her to participate in hair analysis drug tests, arguing that she was concerned about their reliability. The court extended DPHHS's temporary legal custody of A.S. and approved

4

the treatment plan with certain modifications, but did not specifically authorize hair analysis testing.

¶15 At the next review hearing on July 25, 2003, DPHHS reported that S.B. was doing well with her treatment plan and recommended that the court extend temporary legal custody for six months. DPHHS also recommended that A.S. spend two and one-half days each week with S.B. with a gradual increase in time until A.S. was with S.B. full time. The parties and the court agreed.

¶16 In mid-September 2003, S.B.'s urinalysis field tests preliminarily tested positive for drugs. The tests were sent off for confirmation and came back negative for the presence of drugs. Even though S.B.'s tests tested negative a second time, DPHHS suspended S.B.'s unsupervised visits with A.S. until the District Court could review the matter.

¶17 At a hearing held on September 26, 2003, DPHHS requested that S.B. undergo drug testing in the form of hair analysis, contending that S.B. had a history of using masking agents to manipulate urinalysis testing. S.B. again objected to the hair analysis tests. The court determined that since S.B. denied using drugs and since she objected to hair analysis testing, other testing methods, such as a patch, could be used. The court also ordered that S.B. be allowed to resume the unsupervised visits with A.S.

¶18 On October 9, 2003, a Highway Patrol Officer pulled S.B. over for speeding. After S.B. consented to a search, the officer found a syringe and over $300.00 in cash in S.B.'s purse. Although S.B. denied using meth that day, she admitted to the officer that

she had used meth a couple of days prior to the stop and that she was on her way to a bar where she might be tempted to purchase meth.

¶19 The following day, S.B.'s probation and parole officer conducted a search of S.B.'s residence and found a substance used to cleanse the hair of any toxins so that the individual could pass a hair analysis test. After the officer found two syringes in S.B.'s purse, S.B. admitted that she had used meth. The officer arrested S.B. for violating her probation. Upon her release, S.B. was allowed to remain in the Recovery House. However, in November 2003, S.B. was terminated from services at Recovery House for breaking the rules by staying out all night.

¶20 On November 6, 2003, DPHHS filed a Motion for Permanency Hearing as required by § 41-3-455, MCA. Shortly thereafter, the guardian ad litem filed a report recommending that the court consider terminating S.B.'s parental rights to A.S. because of S.B.'s relapse and her arrest for probation violations. The District Court conducted a review hearing on November 14, 2003. At the conclusion of the hearing, the court ordered that S.B.'s visits with A.S. be supervised.

¶21 During November and December of 2003, S.B. wore a series of patches used to test for the presence of drugs. At least two of these patches tested positive for meth while two others showed signs of being tampered with, thus, the integrity of the results of those two tests was compromised. As a result of S.B.'s positive tests and her admissions of recent drug use, DPHHS filed a petition to terminate S.B.'s parental rights to A.S. on January 23, 2004. At the time the termination petition was filed, A.S. had been in foster care just over 15 months. The District Court conducted a hearing on the petition on

March 12 and 30, 2004. After receiving testimony from S.B., her social worker, and others involved in her treatment plan, the District Court terminated S.B.'s parental rights to A.S.

¶22 In its April 1, 2004 Findings of Fact, Conclusions of Law and Order Terminating Parental Rights, the District Court found that continuation of the parent-child legal relationship would likely result in continued abuse or neglect and that dismissing DPHHS's petition would create a substantial risk of harm to A.S. or would be a detriment to A.S.'s physical or psychological well-being. The court concluded that there was clear and convincing evidence that S.B. had not complied with the treatment plan and that the conduct or condition rendering S.B. unfit was unlikely to change within a reasonable time.

¶23 S.B. did not file a Notice of Appeal until October 17, 2005, more than one and a half years after the District Court issued its order. However, because counsel for DPHHS did not file a Notice of Entry of Judgment until November 7, 2005, DPHHS considered S.B.'s appeal to be timely since the time for filing a Notice of Appeal does not begin to run until the losing party is served with Notice of Entry of Judgment. *See In re T.H.,* 2005 MT 237, ¶ 16, 328 Mont. 428, ¶ 16, 121 P.3d 541, ¶ 16.

**Standard of Review**

¶24 We review a district court's decision to terminate an individual's parental rights to determine whether the lower court abused its discretion. *In re Custody and Parental Rights of C.J.K.,* 2005 MT 67, ¶ 13, 326 Mont. 289, ¶ 13, 109 P.3d 232, ¶ 13 (citing *In re J.V.*, 2003 MT 68, ¶ 7, 314 Mont. 487, ¶ 7, 67 P.3d 242, ¶ 7). The test for an abuse of

7

discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *C.J.K.*, ¶ 13 (quoting *In re K.C.H.*, 2003 MT 125, ¶ 11, 316 Mont. 13, ¶ 11, 68 P.3d 788, ¶ 11). However, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *C.J.K.*, ¶ 13 (citing *J.V.*, ¶ 7). To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings and we review those findings to determine whether they are clearly erroneous. *C.J.K.*, ¶ 13. We also review a district court's conclusions of law to determine whether the court interpreted the law correctly. *C.J.K.*, ¶ 13 (citing *J.V.*, ¶ 7).

¶25 In determining whether to terminate parental rights, the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the child, thus the best interests of the child are of paramount concern and take precedence over the parental rights. *C.J.K.*, ¶ 14 (citing § 41-3-609(3), MCA). In addition, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met. *C.J.K.*, ¶ 14 (citing *J.V.*, ¶ 8).

### Issue 1.

¶26 *Whether the District Court properly adjudicated A.S. as a youth in need of care.*

¶27 The District Court had scheduled an adjudicatory hearing for January 8, 2003. While it is not apparent from the record how it occurred, instead of waiting for the January 2003 hearing, the parties appeared before the court on November 26, 2002.

8

Because this hearing was labeled as a "dispositional" hearing, the judge expressed his confusion since there could be no disposition prior to adjudication and the ajudicatory hearing had not yet occurred. The judge inquired of the parties if there had been "some agreement regarding the adjudicatory nature in this matter." Counsel for DPHHS responded that there had been and that she had a treatment plan for the court's consideration. None of the other attorneys present disagreed with counsel's representation to the court.

¶28 At the time of the November 2002 hearing, S.B. was incarcerated as a result of her recent arrest for a drug-related offense. The judge asked S.B.'s counsel if he had an opportunity to review the treatment plan with S.B. and counsel responded that he had and that S.B. wished to complete the treatment plan. Prior to approving the treatment plan, the judge specifically questioned S.B. as to whether she had an opportunity to review it and whether she had any questions. The court recalled that A.S. had already been removed from S.B.'s care once before because S.B. and S.S. were cooking meth in the home. While that case had come to a successful resolution for S.B., S.B. was now before the court again in the very same position. The judge asked S.B. what she had learned in the year since she last appeared before him. S.B. admitted that she was addicted to meth, that she was in need of treatment, and that her addiction had created a very unfair situation for A.S. The court subsequently approved the treatment plan and S.B. signed it.

¶29 S.B. now contends that although she agreed to a treatment plan, she never admitted that A.S. met the legal definition of a "youth in need of care," nor did she stipulate that A.S. was in need of care. S.B. admits that she did stipulate to a temporary

9

extension of the treatment plan until a hearing could occur wherein S.B. could argue for placement of A.S. with her. The State asserts on the other hand that the District Court properly adjudicated A.S. as a youth in need of care based upon S.B.'s own admissions that she was addicted to meth and in need of treatment.

¶30 To adjudicate a child as a youth in need of care, DPHHS must prove by a preponderance of the evidence that the child has suffered from abuse or neglect by a parent. Section 41-3-102(3), MCA. The abuse may be actual physical or psychological harm to a child or substantial risk of physical or psychological harm to a child by acts or omissions of a person responsible for the child's welfare. Section 41-3-102(7), MCA. Parents in such proceedings may stipulate that their child meets the definition of a "youth in need of care" by a preponderance of the evidence without waiving any factual dispute to the allegations. Section 41-3-434(1), MCA.

¶31 The District Court's Order following the November 2002 hearing stated that S.B. stipulated that A.S. met the definition of a youth in need of care by a preponderance of the evidence and that the court questioned S.B. on her understanding of the stipulation and ramifications of that decision. However, a review of the record indicates that S.B. did not so stipulate and the court did not question her about her understanding of the stipulation and ramifications of that decision.

¶32 Rather than allowing counsel for DPHHS to speak for S.B. and state that there had been an agreement regarding adjudication, the District Court should have specifically inquired of S.B. or her counsel whether S.B. stipulated to finding A.S. a youth in need of care. Nevertheless, in this case, it was appropriate for the court to find A.S. a youth in

need of care based upon S.B.'s own admissions, which she made in the presence of her counsel.

¶33    As we stated earlier in this Opinion, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *C.J.K.*, ¶ 13 (citing *J.V.*, ¶ 7). In addition, "[f]undamental fairness and due process require that a parent not be placed at an unfair disadvantage during the termination proceedings." *In re A.N.W.*, 2006 MT 42, ¶ 34, 331 Mont. 208, ¶ 34, 130 P.3d 619, ¶ 34 (citing *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, ¶ 12, 87 P.3d 408, ¶ 12; *Matter of A.S.A.*, 258 Mont. 194, 198, 852 P.2d 127, 129 (1993); *In re A.R.*, 2004 MT 22, ¶ 11, 319 Mont. 340, ¶ 11, 83 P.3d 1287, ¶ 11). However, we have also stated that "[a]s a practical matter . . . pre-termination hearings entitle the parent to less process than the actual termination proceedings." *A.N.W.*, ¶ 35.

¶34    Based on the facts in this case, we cannot conclude that S.B. was placed at an unfair disadvantage during the termination proceedings. S.B. was represented by counsel at all stages of the proceedings. She had an opportunity to speak on her own behalf at the adjudicatory hearing and she testified at that time that the representations her counsel made on her behalf at that hearing were accurate. S.B. admitted that she was addicted to meth, that she needed treatment, and that her addiction impacted A.S. unfairly. It was undisputed that S.B. was incarcerated on a felony drug charge awaiting disposition and that A.S.'s father was in prison for a drug conviction.

¶35    Neither S.B. nor her counsel objected to the statements made by counsel for DPHHS that there had been an agreement regarding the adjudication in this matter.

11

Moreover, as the State points out in its brief on appeal, S.B.'s acquiescence in A.S.'s adjudication is further demonstrated by the fact that the adjudication is referenced in almost every court document leading up to the termination hearing. However, in the almost 16 months between the adjudicatory hearing and the termination hearing, S.B. never objected or even indicated to the court that there were any irregularities in the adjudicatory proceeding. It was not until she filed her brief on appeal that she brought up this issue. We have repeatedly stated that "we will not fault a district court for failing to address statutory deficiencies that are not brought to its attention during the proceedings because doing so would encourage litigants to withhold objections rather than raise the issues appropriately in the district court." *A.N.W.*, ¶ 41 (citing *In re T.E.*, 2002 MT 195, ¶ 23, 311 Mont. 148, ¶ 23, 54 P.3d 38, ¶ 23).

¶36    Indeed, it was an additional 19 months from the time of the termination hearing until S.B. filed her Notice of Appeal. While we stated previously in this Opinion that we, nevertheless, had to consider S.B.'s appeal to be timely, *see* ¶ 24, the fact remains that a considerable amount of time passed before the appeal was filed.

> Section 41-3-604(1), MCA, entitled "[w]hen petition to terminate parental rights required" presumes that if a child has been in foster care for 15 of the most recent 22 months, it is in the best interests of the child to terminate parental rights.

*A.N.W.*, ¶ 54. Here, almost 16 months passed between the adjudicatory hearing and the termination hearing, and an additional 19 months passed between the termination hearing and the filing of the Notice of Appeal, a total of 35 months.

¶37 To reverse the District Court's termination order and remand for further proceedings now, as the dissent wishes to do, would simply be a matter of prolonging the inevitable based upon the requirements of § 41-3-604(1), MCA. The best interests of the child are of paramount concern and must take precedence over the parental rights. C.J.K., ¶ 14 (citing § 41-3-609(3), MCA). We cannot conclude that it would be in A.S.'s best interests to prolong this matter when much of the delay was caused because S.B. relapsed time and again and failed to put her child's needs above her desire to indulge her addiction.

¶38 Accordingly, we hold that the District Court properly adjudicated A.S. as a youth in need of care.

## Issue 2.

¶39 *Whether the District Court's findings of fact were clearly erroneous.*

¶40 S.B. contends that the District Court made several errors in its findings of fact because it attributed certain testimony to the wrong witnesses; it picked out only negative aspects of the testimony; and it ignored testimony in support of reuniting S.B. with A.S. The State contends that although the court did erroneously attribute pieces of information to one witness rather than to another, the underlying facts are amply supported by the record.

¶41 The facts presented at the termination hearing established that although S.B. was moving towards successful completion of her treatment plan, she began using meth again and, as a result of her decision to use, S.B. was terminated from her treatment program and had to move out of the recovery house where she resided. Consequently, instead of

13

the time she spent with A.S. being increased, S.B.'s time with her daughter was scaled back.

¶42 S.B. was also arrested for numerous drug-related probation violations and drug-related offenses. Once she was released from jail, S.B. continued to use meth and she did not seek the services available to her. At the termination hearing, S.B. admitted that she did not successfully complete her treatment plan.

¶43 Even discarding the findings of which S.B. complains, there is still overwhelming evidence (including S.B.'s own admissions) that S.B was actively using meth and other dangerous drugs up until the time of the termination hearing. For example, S.B. argues that the District Court should not have allowed testimony regarding the results of patch tests because there is no demonstrated accuracy of this type of testing. However, although S.B. did object to hair analysis tests, she never objected to the use of patch tests and she agreed in her amended treatment plan to submit to this type of testing. As the State points out in its brief on appeal, if S.B. was concerned about the accuracy of patch tests, the time to raise the concern was during the hearing regarding her amended treatment plan.

¶44 While it is true that the court attributed certain testimony regarding S.B.'s drug use to the wrong witnesses, the fact remains that testimony by reliable witnesses regarding S.B.'s continued drug use was elicited at the termination hearing. And, contrary to S.B.'s contention that the lower court disregarded the positive testimony provided about her at the termination hearing, the court's findings of fact do highlight the things S.B. did well, such as her successful completion of inpatient treatment. Unfortunately, despite all of

S.B.'s accomplishments and her periods of sobriety, the record reflects that S.B. continued to use meth and other dangerous drugs up to the time of the termination hearing.

¶45 Accordingly, we affirm the District Court's ultimate finding that dismissing DPHHS's petition to terminate S.B.'s parental rights would create a substantial risk of harm to A.S. or would be a detriment to A.S.'s physical or psychological well-being.

**Issue 3.**

¶46 *Whether the District Court abused its discretion in terminating S.B.'s parental rights.*

¶47 A district court may terminate an individual's parental rights if it finds by clear and convincing evidence that the child has been adjudicated a youth in need of care; an appropriate court-approved treatment plan has not been complied with or has been unsuccessful; and the conduct or condition rendering the parent unfit is unlikely to change within a reasonable period of time. Section 41-3-609(1)(f), MCA.

¶48 Determining whether the conduct or condition rendering a parent unfit is unlikely to change within a reasonable time "requires the court to assess past and present conduct of the parent." *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, ¶ 37, 991 P.2d 972, ¶ 37 (citing *In re C.A.R.*, 214 Mont. 174, 187, 693 P.2d 1214, 1221 (1984)). We must consider "excessive use of intoxicating liquor or of a narcotic or dangerous drug that affects the parent's ability to care and provide for the child." Section 41-3-609(2)(c), MCA.

¶49 S.B. contends that the record is clear that she maintained her sobriety from November 26, 2002, to October 8, 2003, and that the only remaining issue on September 26, 2003, was that she needed to arrange for daycare and show DPHHS her budget which she had been working on with her treatment provider. S.B. admits, however, that in October and November 2003, she began to relapse. She argues that, rather than provide her with support services, DPHHS opted to terminate her parental rights based on these relapses and the fact that A.S. had been in foster care for 15 of the last 22 months. S.B. claims that the termination of her parental rights was not justified because DPHHS did not prove that the conduct or condition rendering her unfit was unlikely to change within a reasonable time.

¶50 The State asserts that despite S.B.'s successful completion of some aspects of the treatment plan, S.B. did not successfully complete the treatment plan because she continued to use meth and, as a result of her meth addiction, S.B. was facing new criminal charges and numerous probation violations. In fact, her probation officer testified that S.B.'s violations were increasing rather than decreasing. In addition, S.B. failed to steadily maintain employment and, at the time of the termination hearing, S.B. was not employed and had no plan in place for supporting her daughter or herself.

¶51 This court will not reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the district court. *In re A.F.*, 2003 MT 254, ¶ 24, 317 Mont. 367, ¶ 24, 77 P.3d 266, ¶ 24 (citing *In re M.T.*, 2002 MT 174, ¶ 29, 310 Mont. 506, ¶ 29, 51 P.3d 1141, ¶ 29; *In re E.K.*, 2001 MT 279, ¶ 43, 307 Mont. 328,

16

¶ 43, 37 P.3d 690, ¶ 43). Moreover, pursuant to § 41-3-604(1), MCA, "[i]f a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights." By the time of the termination hearing, A.S. had been in foster care for more than 17 months, but rather than make every effort to maintain her sobriety so that she could once again parent her child, the number of S.B.'s relapses increased.

¶52 We hold that the District Court correctly concluded that the conduct or condition rendering S.B. unfit to parent A.S. was unlikely to change within a reasonable time. S.B. had been given every opportunity to maintain her sobriety, but despite all of the resources available to her, her addiction to meth was stronger than her desire to maintain her sobriety and parent her child. Under these circumstances, it was incumbent upon the District Court to consider the best interests of the child and the court correctly concluded that termination of S.B.'s parental rights to A.S. was in A.S.'s best interests.

¶53 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE

17

Chief Justice Karla M. Gray, dissenting.

¶54 I respectfully dissent from the Court's Opinion on Issue 1. I would hold that no adjudication occurred in this case, either via an adjudicatory hearing or a stipulation by the mother that the child was a youth in need of care. Moreover, since the termination order reflects this omission in that it does not contain the finding required by § 41-3-609(1)(f)(i), MCA—namely, that the child is an adjudicated youth in need of care—I would reverse that order.

¶55 In cases involving petitions to terminate parental rights pursuant to § 41-3-609(1)(f), MCA, "a district court cannot obtain jurisdictional authority to award [DPHHS] permanent legal custody absent such proper adjudication pursuant to the hearing mandated by § 41-3-404, MCA [recodified as § 41-3-437, MCA]." *In re F.M.*, 2002 MT 180, ¶ 29, 311 Mont. 35, ¶ 29, 53 P.3d 368, ¶ 29 (citing *In re Custody of M.W.*, 2001 MT 78, ¶ 46, 305 Mont. 80, ¶ 46, 23 P.3d 206, ¶ 46, and *Matter of M.J.W.*, 1998 MT 142, ¶ 11, 289 Mont. 232, ¶ 11, 961 P.2d 105, ¶ 11). A statutory exception to the requirement for an adjudicatory hearing exists, of course, pursuant to which a parent may stipulate that "the child meets the definition of a youth in need of care by the preponderance of the evidence[.]" *See* § 41-3-434(1), MCA.

¶56 In the present case, the Court admits quite candidly that the sole basis for the adjudication stated by the District Court simply does not exist on this record. Specifically, the District Court's Order of Adjudication states that the child's mother "stipulated that the youth met the definition of a 'youth in need of care' by the preponderance of the evidence. The Court questioned the youth's mother on her

18

understanding of the stipulation and the ramifications of their [sic] decision[,]" and, thereupon, adjudicated the child as a youth in need of care.

¶57 As a matter of record, no such stipulation by the mother occurred and the District Court did not question the mother on her understanding of the purported stipulation and its ramifications. Indeed, the entirety of the record on this subject is as follows:

> THE COURT: I note that this matter is set for a dispositional hearing. Has there been some agreement regarding the adjudicatory nature in this matter?
>
> [DEPUTY COUNTY ATTORNEY]: Yes, Your Honor. I have a treatment plan here.
>
> THE COURT: Very well.
>
> [DEPUTY COUNTY ATTORNEY]: May I approach?
>
> THE COURT: You may. [Mother's counsel], have you had an opportunity to review this treatment plan with S.B.?
>
> [MOTHER'S COUNSEL]: Yes, I have.

Neither the mother nor her counsel stipulated to anything relating to the State's burden to prove the child was a youth in need of care by a preponderance of the evidence, and the District Court—not surprisingly—had no conversation with the mother about the nonexistent stipulation. Moreover, the deputy county attorney's reference to a treatment plan—in response to the District Court's inquiry about "some agreement regarding the adjudicatory nature in this matter"—in no way satisfies the requirement for a stipulation regarding youth in need of care status or, in the alternative, an adjudicatory hearing.

¶58 The statutes relating to termination pursuant to § 41-3-609(1)(f), MCA, are clear in their requirement for either a stipulation or an adjudicatory hearing. *See* §§ 41-3-

19

434(1) and -437, MCA. Our jurisprudence is equally clear. We consistently have held that the adjudication of a child as a youth in need of care is a threshold requirement, without which a person's parental rights may not be terminated under § 41-3-609(1)(f), MCA. *See, e.g.*, *In re M.B.*, 2004 MT 304, ¶ 16, 323 Mont. 468, ¶ 16, 100 P.3d 1006, ¶ 16 (citation omitted); *In re B.N.Y.*, 2003 MT 241, ¶ 22, 317 Mont. 291, ¶ 22, 77 P.3d 189, ¶ 22 (citations omitted); *In re M.O.*, 2003 MT 4, ¶ 12, 314 Mont. 13, ¶ 12, 62 P.3d 265, ¶ 12 (citations omitted). We also have held that a district court must adequately address each applicable statutory requirement before terminating an individual's parental rights. *In re B.B.*, 2006 MT 66, ¶ 18, 331 Mont. 407, ¶ 18, 133 P.3d 215, ¶ 18 (citations omitted). Similarly, we have admonished that child abuse and neglect cases must be conducted in strict compliance with relevant statutes. *See Inquiry into M.M.*, 274 Mont. 166, 174, 906 P.2d 675, 680 (1995); *Matter of F.H.*, 266 Mont. 36, 40, 878 P.2d 890, 893 (1994). The Court is apparently willing to overlook both the statutes and our jurisprudence. I am not.

¶59 We also have held, many times, that proceedings involving the termination of parental rights must meet the due process requirements guaranteed by the Montana and United States Constitutions. Stated differently, a parent's right to the care and custody of a child represents a fundamental liberty interest and, consequently, fundamentally fair procedures must apply at all stages in proceedings to terminate parental rights. *See, e.g.*, *In re A.N.W.*, 2006 MT 42, ¶ 34, 331 Mont. 208, ¶ 34, 130 P.3d 619, ¶ 34 (citations omitted); *In re V.F.A.*, 2005 MT 76, ¶ 6, 326 Mont. 383, ¶ 6, 109 P.3d 749, ¶ 6 (citation omitted); *In re A.S.*, 2004 MT 62, ¶ 12, 320 Mont. 268, ¶ 12, 87 P.3d 408, ¶ 12 (citations

omitted); *In re B.N.Y.*, ¶ 21 (citation omitted). Again, the Court apparently is willing to disregard our jurisprudence, and this mother's constitutional rights. I am not.

¶60 Stating a parent is entitled, as a practical matter, to less due process at pre-termination hearings than at actual termination proceedings, the Court concludes S.B. was not placed at an unfair disadvantage because she was represented by counsel and did not object at the purported adjudicatory hearing. The Court points to no case, however, in which we have held that a parent must assert that an adjudication has not occurred—let alone that the district court has not made a finding regarding adjudication in the termination order—to preserve the issue for appeal. Indeed, in a termination proceeding under § 41-3-609(1)(f), MCA, it is the petitioner's burden to establish by clear and convincing evidence—not the parent's burden to establish a lack of evidence—that the child is an adjudicated youth in need of care. *See In re Custody and Parental Rights of D.T.*, 2002 MT 232, ¶ 10, 311 Mont. 463, ¶ 10, 56 P.3d 859, ¶ 10 (citation omitted). Moreover, the primary reason that we decline to address issues raised for the first time on appeal is that it is unfair to fault the trial court on an issue it never had the opportunity to consider. *See, e.g.*, *Kallowat v. State*, 2004 MT 152, ¶ 12, 321 Mont. 501, ¶ 12, 92 P.3d 1176, ¶ 12 (citation omitted). The District Court's termination order recites the statutory requirement for a finding that the child is an adjudicated youth in need of care, but does not contain such a finding. These circumstances suggest, at least, that the District Court had the opportunity to consider whether an adjudication occurred and determined—correctly, in my view—that the required finding was not supported by the record. For these reasons, I would conclude our rule regarding issues raised for the first time on

appeal does not apply here.

¶61 As its primary justification for the decision it reaches here, the Court sets forth the mother's admissions—about her addiction, the impacts of her addiction on her child, and her need for treatment—as well as the undisputed facts that the mother was incarcerated awaiting disposition on a felony drug charge and the father was in prison for a drug conviction. It is true these matters are of record. It also is true that none of these matters relate to an adjudication that the child is a youth in need of care. Indeed, the mother did not *testify* to the referenced matters; her statements came during a discussion with the District Court about the treatment plan, a discussion that should have occurred *after* either a stipulation or an adjudication based on the preponderance of the evidence presented that the child is a youth in need of care. *See* §§ 41-3-434(2) and -443(1), MCA; *In re B.N.Y.*, ¶ 24. Nor does the fact that the mother was incarcerated at the time of the *dispositional* hearing excuse the utter lack of an *adjudicatory* hearing—or stipulation—required for a youth in need of care determination. Finally, the father's imprisonment has no bearing on whether the child was adjudicated as a youth in need of care with respect to the mother. *See In re Custody of M.W.*, ¶ 49.

¶62 The simple facts remain: no stipulation, no adjudicatory hearing and no proof from the State that the child was a youth in need of care. Thus, the entire basis upon which the District Court purportedly adjudicated the child as a youth in need of care, set forth above, is a fabrication.

¶63 Setting forth §§ 41-3-604(1) and -609(3), MCA, and language from our prior cases, the Court also reasons that termination is in A.S.'s best interests and, given the

time factors outlined in § 41-3-604(1), MCA, reversing and remanding would "prolong[] the inevitable." I recently urged—unsuccessfully—that our recognition of a district court's obligation to give paramount consideration to the child's best interests was not appropriately invoked as a *post hoc* rationalization for a petitioner's failure to present, and a court's failure to receive, evidence at a termination hearing. *See In re A.T.*, 2006 MT 35, ¶ 31, 331 Mont. 155, ¶ 31, 130 P.3d 1249, ¶ 31 (Gray, C.J., dissenting). Similarly, here, I do not believe our recognition of a district court's consideration of the child's best interests "erases" the due process violation that occurred when S.B.'s parental rights were terminated under § 41-3-609(1)(f), MCA, without a prior adjudication of the child as a youth in need of care or a finding in the termination order that the child was so adjudicated. Nor do I agree with the Court's statement that reversing and remanding in this case would "prolong the inevitable," as such "ends justifies the means" reasoning—taken to its logical extent—could eventually vitiate all due process rights afforded to parents by Montana statutes and our cases.

¶64 I am saddened by the Court's facile resolution of this case. I had thought we were moving toward consistently implementing the principles set out so often and so clearly in our jurisprudence. Apparently I was wrong. Ordinarily, I do not mind being wrong. I do mind here. If this Court will not hold district courts and county attorneys to the requirements so clearly spelled out by the Montana Legislature, who will? What will become of a parent's supposed constitutional liberty interest in the care and custody of her child? And, finally and most importantly, what will become of Montana's children whose best interests might be served by reunification with their parents absent this

23

Court's benign neglect and disregard for statutorily required procedures?

¶65     I would reverse the District Court on the adjudication issue and also reverse the termination order on the grounds that it did not rest upon a valid adjudication of the child as a youth in need of care.  I dissent from the Court's failure to do so.


/S/ KARLA M. GRAY