DA 08-0551

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 113

IN THE MATTER OF:

B.S. and G.S.,

    Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade,
Cause Nos. DDJ-07-130-Y; DDJ-07-0131-Y
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Robin Meguire; meguirelaw.com, Great Falls, Montana

    For Appellee:

    Hon. Steve Bullock, Montana Attorney General; Jonathan M. Krauss, Assistant Attorney General, Helena, Montana

    John Parker, Cascade County Attorney; Theresa Diekhans, Deputy Cascade County Attorney, Great Falls, Montana

Submitted on Briefs:  March 4, 2009

Decided:  April 7, 2009

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      The mother of two minor children, B.S. and G.S., appeals from the termination of her parental rights to those children. We affirm the judgment entered by the Eighth Judicial District Court, Cascade County.

¶2      The issue is whether the District Court erred in terminating the mother's parental rights to B.S. and G.S.

## BACKGROUND

¶3      On August 23, 2007, the mother voluntarily placed her children, B.S. and G.S., in the custody of the Montana Department of Public Health and Human Services (DPHHS). At that time, the mother was staying at the Mercy Home shelter for domestic abuse victims in Great Falls, Montana, and had obtained a restraining order against the father and custody of the children. G.S., who was then 5 years old, had run away from the shelter three times in one day and had been hitting other children there, and the mother stated she was concerned that she might abuse him or her then-3-year-old daughter, B.S.

¶4      DPHHS had received prior reports of domestic violence within B.S. and G.S.'s family. It petitioned for emergency protective services and temporary investigative authority (TIA) as to both children. In the intervening month before the October 1, 2007 TIA hearing, criminal charges unrelated to these proceedings were filed against both the mother and the father. At the hearing, the mother stipulated to TIA for 90 days. The father, who was then incarcerated on the pending charges, contested DPHHS's petitions.

¶5 A DPHHS caseworker testified at the TIA hearing that B.S. was again living with the mother at Mercy Home. G.S. had been placed, temporarily, at a children's receiving home following breakdowns of two foster care placements due to his violent behavior. DPHHS presented testimony about the family's history of domestic violence. The mother told the court that, during one argument, the father was choking her and "had me up against a wall and everything was going black, I felt like my eyes were going to pop out. And I was trying to tell him our son was watching." The mother also testified that, while she was living in a domestic violence shelter in Washington state, she and another woman were walking on a sidewalk with their children in a double stroller when the father drove by and "somehow" came up onto the sidewalk, ramming the stroller with his car. In addition, the mother, the father, and a caseworker all testified about an August 2007 physical tug-of-war over B.S. between the father and the mother outside the Great Falls courthouse, in which the mother ripped B.S.'s shirt while trying to pull her away from the father and the father slammed the mother's hand in the car door.

¶6 The mother testified she had anger issues, had been diagnosed with attention deficit disorder (ADHD) since childhood, and was working on getting her medications adjusted properly. The DPHHS caseworker testified she had set up a psychological evaluation concerning the mother's unaddressed mental health issues. The father testified the mother had a history of taking prescribed medication for a week or two and then stopping because she did not like the side effects.

¶7 DPHHS presented testimony by Mercy Home staff members that G.S. had exhibited

3

serious behavioral problems and had hit another boy at the shelter, had thrown a toy at another child, and had run away from the shelter several times. One shelter worker stated, "You know, he seems very angry." A DPHHS caseworker also testified that a speech evaluation indicted G.S. was 2 years behind in his speech development.

¶8 The District Court continued DPHHS's TIA. It also found, sua sponte, probable cause to believe B.S. and G.S. were youth in need of care, and adjudicated them as such.

¶9 About a month later, after the mother was evicted from Mercy Home for not following the rules, B.S. was placed in foster care. Both parents agreed to court-approved treatment plans at a December 2007 dispositional hearing. Both parents also stipulated to DPHHS's temporary legal custody of the children for 6 months.

¶10 In June of 2008, DPHHS petitioned for permanent legal custody of B.S. and G.S. and for termination of the parental rights of both parents, who by then both were incarcerated in federal prisons. The District Court held a termination hearing in August of 2008. Because the court was unable to establish a telephone connection allowing the mother to participate in the hearing from prison, the court continued the proceedings as to her. The father participated by telephone, and the court terminated his parental rights at the end of the hearing. We recently affirmed that judgment. *See In re B.S. and G.S.*, 2009 MT 98, ___ Mont. ___, ___ P.3d ___ (*In re B.S. and G.S. I*).

¶11 The District Court held a hearing on the petition to terminate the mother's parental rights in September of 2008, at which the mother participated by telephone. The court took judicial notice of its findings from the father's termination hearing a month earlier, then

4

invited evidence of matters outside that record.

¶12 DPHHS's first witness was clinical psychologist Peter Lloyd Stivers, who had evaluated the mother at DPHHS's request before she went to prison. Stivers testified he had conducted a clinical interview with and administered cognitive, intellectual, personality, and parenting tests to the mother. According to Stivers, the tests showed the mother has ADHD and an adjustment disorder with depression and anxiety, and has an anti-social personality trait as well. Based on his interview and testing, Stivers concluded the mother would need a lot of tangible support, beginning with stabilization on her medication but also including family-based services and respite care, before she could parent. Stivers further opined it would be "very overwhelming" for the mother to try and parent and work at the same time. When he originally evaluated the mother, he estimated it would take her three to six months to become stabilized. He testified her imprisonment after his interview and testing "obviously complicates that and prolongs the amount of time before" she could conceivably parent. Stivers testified that, following the mother's imprisonment and in light of her background, it would take her a year or more of psychotherapy to "get[] back to start," learn a new way of living, and parent her children.

¶13 A DPHHS caseworker testified she had begun working with the mother on her treatment plan before the mother went to prison. The first goal of the mother's treatment plan was to obtain safe housing for herself and the children. The caseworker testified the mother had moved in with two men she met two days earlier at the Rescue Mission, one of whom left after he had "a small relationship" with her. The mother then began a relationship

5

with the other man. She did not begin parenting classes at that time because of Stivers' recommendation that she become stabilized on her medications before beginning classes.

¶14 The mother had been sentenced on April 3, 2008, to 24 months in federal custody on charges of credit card fraud and fraudulent use of another person's social security number. She testified at the termination hearing that she understood she would be eligible for release to a halfway house prerelease center in March of 2009. She was not certain what she would have to do to be released from the prerelease center, but believed she would be required to have a job and follow the halfway house rules, which she had been told were strict. The mother also testified the prison did not provide inmates with stimulant medication because of the potential for abuse. As a result, she was not able to take all of her medication for ADHD while she was in prison. Nor had she been able to undergo professional counseling in prison.

¶15 A caseworker testified B.S. was living in a preadoptive placement with foster parents. G.S. had been placed with that family, too, until he assaulted B.S. and another daughter in the household, which resulted in his being moved elsewhere. Six-year-old G.S. had been in 17 residential placements during the preceding year, and was possibly headed for "the next level" of inpatient therapeutic treatment due to his extreme levels of violence. The court-appointed attorney for the children recommended that the mother's parental rights be terminated based on the children's best interests and their needs for immediate assistance and resolution.

¶16 The District Court found that, to the extent the mother had not complied with her treatment plan, it was not due to any lack of effort on her part prior to her incarceration. The

6

court found, however, that the mother had not completed the treatment plan in that, during her incarceration, she had no ability to provide or maintain a safe home and was unable to follow up with the prescribed treatment for her psychological or mental health conditions or to complete the in-home parenting program. The court also found the mother had not completed the parenting class and anger control aspects of the treatment plan. In sum, the court found that, despite the mother's efforts before her incarceration, the treatment plan remained substantially incomplete.

¶17 The court concluded the mother had not complied with her treatment plan and suffers from the mental health and psychological conditions diagnosed by Stivers. It also concluded she was subject to long-term confinement which would not terminate until at least late 2009, and her circumstances of being held in federal custody render her unable to adequately care for the children and provide adequate parental care "notwithstanding her earnest desire to resume parenting upon discharge of her federal sentence." The court concluded the condition rendering the mother unfit or unable to parent is unlikely to change within a reasonable time; it was in B.S.'s and G.S.'s best interests to provide them stability in a safe environment; and it was in B.S.'s best interests to maintain the safe and stable pre-adoptive foster placement and in G.S.'s best interests to continue to receive therapeutic care to address his serious and substantial behavior problems. Accordingly, the court concluded legal cause existed to terminate the mother's parental rights.

DISCUSSION

¶18 *Did the District Court err in terminating the mother's parental rights to B.S. and G.S.?*

7

¶19 We review a district court's decision to terminate parental rights for abuse of discretion. *In re D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691. In order to satisfy the statutory requirements for termination of parental rights, the party seeking termination must prove its case by clear and convincing evidence, and the court must make specific factual findings. We review the court's findings to determine whether they are clearly erroneous, and we review the court's conclusions of law to determine whether they are correct. *In re D.B.*, ¶ 18.

¶20 The mother argues the District Court's findings of fact were not based on clear and convincing evidence because the court did not recite that standard. The mother has not identified, nor are we aware of, any requirement that a district court must recite the clear and convincing evidence standard in its findings; § 41-3-609(1), MCA, requires proof to be made by clear and convincing evidence but does not require the court to recite that standard of proof in its findings of fact. Here, the court stated that "pursuant to § 41-3-609(1)(f)" it found legal cause to terminate the mother's parental rights. Section 41-3-609(1)(f), MCA, incorporates the clear and convincing evidence standard. Under these circumstances, we conclude the court's failure to recite the clear and convincing evidence standard does not constitute error.

¶21 The mother next claims the finding that her incarceration rendered her unfit and was long-term and unlikely to change within a reasonable time is clearly erroneous because of her testimony that she may be released within 6 months of the termination hearing. We disagree. Section 41-3-609, MCA, does not define "long-term confinement." However, in *In*

8

*re M.P.*, 2008 MT 39, ¶ 30, 341 Mont. 333, 177 P.3d 495, we noted this statute specifically directs district courts to consider long-term confinement and incarceration lasting "more than 1 year." In this case, the DPHHS caseworker testified, and the mother confirmed, that she had been sentenced in April of 2008 to serve 24 months in prison. At the time of the termination order, the mother's testimony concerning her potential early release was not verified by any documentation or testimony by federal authorities. Beyond that, the mother's optimism about her potential early release from confinement and subsequent readiness to parent was offset by her uncertainty about how long she would be required to stay at a prerelease center. We conclude the court's finding that the mother's incarceration rendered her unfit, was long-term and unlikely to change within a reasonable time was supported by substantial evidence and is not therefore clearly erroneous.

¶22 The mother contends the District Court should have ordered an alternative to termination such as a long-term guardianship, foster placement, or a custody arrangement. She points out that discussion was had about alternatives at the termination hearing. She fails, however, to cite any authority that the court was required to order an alternative to termination. In addition, as discussed in the father's appeal, exploration of possible placements with extended family members had not produced any viable options. *See In re B.S. and G.S. I*, ¶ 27. We conclude the mother has not demonstrated an abuse of discretion.

¶23 The mother makes several claims of error relating to the District Court's adjudication of B.S. and G.S. as youth in need of care. She first argues the court erred during the show cause hearing when it adjudicated B.S. and G.S. youth in need of care, because DPHHS was

9

not seeking such adjudication, but only TIA. As we recently ruled in the father's appeal, *In re B.S. and G.S. I*, ¶ 20, and as the mother admits in her brief, the court possessed statutory authority to adjudicate the children as youth in need of care at the show cause hearing. The mother has not established abuse of that statutory authority.

¶24 The mother claims the court's finding that the children were youth in need of care (YINC) was clearly erroneous because DPHHS did not prove by a preponderance of the evidence that the children had suffered from abuse or neglect by a parent, as is required for a YINC adjudication. *See In re A.S.*, 2006 MT 281, ¶ 30, 334 Mont. 280, 146 P.3d 778. The mother contends the court based its decision solely on the children's observations of domestic abuse and violence between the parents. She also points out that no psychological evaluations of the children had taken place and no expert medical testimony was introduced at that hearing.

¶25 The mother cites no authority requiring psychological evaluations or expert medical testimony before a YINC adjudication. Further, the abuse or neglect necessary to support a YINC adjudication may be actual physical or psychological harm <u>or</u> substantial risk of physical or psychological harm to the children by acts or omissions of a parent responsible for the child's welfare. Section 41-3-102(7), MCA. Here, the court heard testimony at the initial hearing about several incidents in which the children were right in the middle of the domestic abuse—the stroller ramming, the father choking the mother while G.S. was watching, and the tug-of-war over B.S. in which the mother ripped B.S.'s shirt outside the Great Falls courthouse. At the time the court made its YINC adjudication, the father was

incarcerated and the mother, unable to parent the children even in the safety of the Mercy Home, had voluntarily relinquished the children. Moreover, G.S. then had to be placed at a children's receiving home following removal from two foster homes for violent behavior. In addition, the evidence at the initial hearing demonstrated that the mother had serious mental health issues (including "anger issues") that negatively impacted her parenting abilities and were acknowledged by the mother, yet remained unaddressed. Under the circumstances presented here, we conclude the court's finding that the children were youth in need of care was supported by a preponderance of the evidence.

¶26    In her final claim relating to the YINC adjudication, the mother contends her due process rights were violated when the court adjudicated the children as youth in need of care without providing her with notice. Alternatively, the mother contends her trial counsel rendered ineffective assistance by failing to object on this ground. We disagree as to both contentions. Although it is true that DPHHS did not request YINC adjudication at the show cause hearing, the mother's citations to appear at that hearing specifically required her to "show cause, if any you may have, why said youth should not be declared youth in need of care."

¶27    Finally, the mother argues termination of her parental rights violates Montana public policy, which requires protection of children in a family environment and preservation of the unity and welfare of the family whenever possible. *See* § 41-3-101(1)(b), MCA. This argument is without merit.

¶28    We observe that the statutory provision upon which the mother relies is, by its own

11

terms, to be applied "whenever possible." Here, the mother's imprisonment for her criminal conduct already has resulted in disruption of the unity of the family for as much as two years—one-third of G.S.'s life and half of B.S.'s life. In addition, Stivers predicted it will take the mother an additional year after her release from prison to get stabilized on medications and undergo psychotherapy to a point where she might start to be able to parent.

¶29 We further observe that § 41-3-101(4), MCA, provides that the child's health and safety are of paramount concern in implementing the policy set forth in that statute. Evidence such as the DPHHS caseworker's testimony about the mother's choice of living situation after she was evicted from the Mercy Home—moving into an apartment with two men she had just met at the Rescue Mission—does not promote confidence in the mother's ability to protect her children's health and safety. The record strongly suggests that G.S., in particular, requires specialized care, obviously unavailable from his parents. Moreover, the children's court-appointed attorney testified it would be in the children's best interests to terminate the mother's parental rights.

¶30 Unfortunately, here, the record establishes that preservation of the unity of B.S. and G.S.'s family of origin is impossible while the mother serves her prison sentence and, after that time, would not be conducive to the health, safety and best interests of the children. As a result, we reject the mother's argument that termination of her parental rights violates Montana public policy.

¶31 Affirmed.

/S/ MIKE McGRATH

12

We concur:


/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON